THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RAYMOND J. BEAN, Defendant-Appellant.

First District (5th Division)   No. 76-541

Opinion filed July 28, 1978.

James D. Montgomery, of Chicago (Donald Hubert, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Linda Dale Woloshin, and Joseph P. Quirk, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Following a jury trial defendant, Raymond J. Bean, was found guilty on one count of delivery of a controlled substance, consisting of less than 30 grams of morphine (Ill. Rev. Stat. 1973, ch. 56½, par. 1401(b)), and three counts of possession of a controlled substance; to-wit, more than 200 grams each of amphetamine and barbituric acid derivatives (barbiturates) (Ill. Rev. Stat. 1973, ch. 56½, pars. 1402(a)(5) and (6)), and less than 200 grams of demerol (Ill. Rev. Stat. 1973, ch. 56½, par. 1402(b)). He was sentenced to serve concurrent terms of 1 to 3 years on the delivery and possession of demerol offenses, and 4 to 12 years on the remaining two possession offenses.

On appeal, defendant contends that: (1) he was not proved guilty beyond a reasonable doubt; (2) prejudicial error occurred during the State's cross-examination of a police informant; (3) the trial court erred in denying defendant's motion to sever the delivery and possession counts; (4) the trial court erred in allowing the police informant to testify as to the source of defendant's drugs; (5) the sentence imposed on the possession of amphetamine offense was improper; and (6) the maximum sentence of 12 years imposed on the two more serious possession counts was excessive. We affirm. The pertinent facts follow.

Martin J. Kehoe, an undercover Chicago police officer, testified that on January 11, 1974, he went to the Catfish Row Tavern at 22 West Elm Street, Chicago, Illinois. Kehoe was wearing a beard, long hair, and was

dressed in faded jeans, a motorcycle jacket, and a pair of boots. Kehoe was accompanied by Mario Sadjek, who was not a member of the police department. Once inside, Sadjek introduced Kehoe to defendant. The three men then sat down at a corner table and Sadjek and defendant started discussing the price Sadjek would charge to recover defendant's impounded yacht for him.

Kehoe interrupted this conversation and asked defendant if he had the narcotics that Kehoe was supposed to buy from him. Defendant stated that he did not have it because he had been busy when he was at work and had been unable to get the "stuff." Kehoe displayed a large sum of money to defendant and "acted mad," because he would have to return to his friends without the narcotics he had promised for a party that night. Defendant said he was sorry that he did not bring it, but repeated that he did not have the chance to get it at work. He had been busy while at work and had not been left alone very much. However, he did tell Kehoe that he had "things" at his apartment, but Kehoe told him that he wasn't interested in pills. After defendant's fears that he might be dealing with a policeman were dismissed, defendant stated that he could get the narcotics at work that night and suggested they meet again on Monday to complete the transaction.

On Monday, January 14, shortly after 3 p.m., Kehoe and Sadjek drove to the tavern, accompanied by Officers Grogman and Haughey, who followed in a back-up vehicle. While Kehoe and Sadjek entered the tavern, Grogman and Haughey observed the scene from their unmarked car.

When Kehoe and Sadjek entered the tavern, defendant was seated at the bar. They conversed for a time, and the conversation finally turned to the drugs. Defendant said he would rather deal outside so the three men exited the tavern.

Once outside, defendant told Kehoe to get the drugs from defendant's car, parked across the street. Kehoe went to the car and removed an attache case from the front seat. As he recrossed Elm Street he looked in the case and counted ten boxes. Defendant was walking north at this time, so Kehoe caught up to him and handed him $1000 and apologized for not having the "full fifteen hundred." Kehoe offered to let defendant take some of the drugs back, but defendant responded that he trusted him. Kehoe then asked defendant if he was going to count the money, but defendant just "flipped the corners" and said, "I don't know when we will be able to deal again, because they know the stuff is missing already." Defendant then put the money in his pocket and the three men parted. As defendant walked away he was arrested by Officers Grogman and Haughey.

When questioned as to whether defendant had ever mentioned how he

would obtain the narcotics to sell him, Kehoe stated that defendant indicated he "was the only person on duty in the pharmacy at night, and that he could get usually what he wanted when no one was around." Concerning Sadjek, Kehoe testified that he was helping the police because there were bribery charges pending against him and he wanted his cooperation made known to the State's Attorney. Also, Kehoe stated that it was Sadjek who mentioned the figure of $1500 as the price for the drugs during the January 11 conversation. Sadjek had originally told the police that the price was going to be $1625.

Officer Chris Grogman testified that when he arrested defendant he searched him and recovered the $1000 from his pocket. Defendant was informed of his rights and taken to the police station, where he was questioned. He told the police that he had other drugs at his apartment, as he was planning on opening a pharmacy. Defendant told police that he did not have receipts for these drugs, and he did not respond to Grogman's inquiry concerning where he had obtained them.

Based on this information, the police officers obtained a search warrant and conducted a search of defendant's apartment that same night. In all, they found approximately 274,000 pills in a variety of locations: under the clothes in the dresser drawers; under the bed; in juice jars and Tupperware bowls in the closet; in a black steamer trunk in the closet; and in spice bottles on the spice rack in the kitchen. In the kitchen they also found some hypodermic syringes and a hypodermic needle.

All of the goods seized, including the contents of the attache case as well as the evidence from defendant's apartment, were inventoried and transferred to either the evidence and property section or the police crime lab. The majority of the pills taken from the apartment were placed in five boxes and turned over to the evidence and property section. No charges were brought in connection with these pills because they were not controlled substances. A sixth box of pills was turned over to the crime lab, and these pills form the basis of the possession charges brought against defendant.

Each of the ten boxes found in defendant's attache case was found to contain ten syringes, each filled with a liquid. Gerald B. Pazin, a forensic chemist, testified that he performed tests on the liquid from these syringes and concluded that it was morphine. The total weight of the morphine was 1.5 grams.

Robert Boise, also a chemist, testified that he analyzed the contents of the pills recovered from defendant's apartment. He concluded that certain of the pills contained barbiturates, which weighed about 290 grams, and two other types of pills also contained barbiturates with a total weight of about 352 grams. Other pills contained amphetamine; however, no testimony concerning the weight of these pills was adduced. Lastly,

Boise stated that certain pills contained what is commonly known as demerol. These pills were not weighed; however, Boise was sure that they weighed less than 100 grams.

Mario Sadjek, called as the court's witness, testified that he first met defendant in October of 1973. Later, in December, he saw him again at Catfish Row. They ran into each other a number of times thereafter at the tavern. At first, they usually discussed the collection business. Sadjek, who was 6'4½" tall and weighed 375 pounds, indicated to defendant that it was sometimes necessary to use physical force in this business. They discussed the possibility of defendant hiring Sadjek to retrieve his yacht, which was being detained in Florida.

During these conversations Sadjek learned that defendant was a registered pharmacist. Sadjek asked defendant if he could get various drugs, including speed, which could act as appetite depressants. Defendant never delivered any of these drugs despite Sadjek's requests.

On a later occasion Sadjek asked if defendant could get any stronger drugs, specifically asking for morphine. Defendant indicated they could discuss this at a later time. On January 10, 1974, Sadjek arranged to buy morphine from defendant on the next day. Of his meetings with defendant, Sadjek stated that only three or four dealt with the subject of drugs.

During this period of time, Sadjek was out on bond pending a bribery charge. He testified that Officers Grogman and Haughey informed him that if he provided them with useful information, he might be able to get out of the trouble he was in. After Sadjek gave the officers information which did not check out, five charges were filed against him involving bad checks.

On January 9, 1974, Sadjek called Officer Grogman and told him of his encounters with defendant. The next day he told Grogman that he could set up a narcotics deal with defendant, involving a purchase of morphine and "speed" for $1625.

On January 11 Sadjek went to meet defendant at Catfish Row as arranged. Kehoe accompanied him, posing as Sadjek's brother. Defendant was not there at the arranged time of 3 p.m.; however, he arrived subsequently at approximately 4:10 p.m. Defendant did not have the narcotics, so it was agreed that the transaction would be completed on January 14 at the tavern. During the January 11 meeting defendant exhibited uncertainty about participating in the deal. He was skeptical about Sadjek's being a policeman. During the January 14 transaction defendant appeared fearful and reluctant to complete the deal.

Sadjek also testified that the police had told him to be "verbally strong" with defendant. Therefore, as they left the tavern on January 11 he told

defendant "jokingly" that if he did not show up on Monday with the drugs, he (Sadjek) would break his legs. Defendant responded with a shaking gesture of his head.

Sadjek stated that after his cooperation with the police the charges against him relating to the bad checks were dropped; however, the bribery charge was not affected. Sadjek denied that his defense in a pending Federal case was insanity and stated that he had earlier told the police that defendant had told him the narcotics in his apartment were obtained in a robbery.

Skipper Andrade testified for the defense that he too was a pharmacist, and that he and defendant had agreed in late 1973 to open a pharmacy on the west side of Chicago. The two agreed that defendant would purchase drugs to stock the pharmacy while Andrade looked for a suitable location. During the latter part of 1973 Andrade was aware that defendant had started to acquire drugs for their projected pharmacy. Andrade stated that it was quite common for a pharmacist who intended to open a new business to accumulate and store drugs, similar to those for which defendant was on trial, in his home until the pharmacy actually opened. In fact, after defendant's arrest, Andrade obtained drugs and stored them at the home of his brother-in-law until he finally opened his own pharmacy in Maywood, Illinois. The drugs were stored in cartons, or boxes, in his brother-in-law's basement.

Defendant testified in his own behalf that he first met Sadjek at Catfish Row in October or November of 1973. Thereafter, he ran into Sadjek at the tavern on at least a dozen occasions.

Initially, when defendant would encounter Sadjek they would not discuss much of anything. Sadjek did learn that defendant was a pharmacist and that he was stockpiling drugs to open a pharmacy. He began asking defendant to get him some tinuate, an appetite depressant, and valium for his nerves. On at least six occasions Sadjek requested tinuate. Defendant would always tell him that he forgot it and that he would bring it the next time he came to the tavern. However, he never intended to supply these drugs to Sadjek, and in fact never did so.

During these same conversations defendant told Sadjek that he and a partner owned a boat that they chartered to help defray its expense, but that the boat had been confiscated in Florida because the renters had misused it. Sadjek said that he ran a collection agency and if hired by defendant he would get his boat back for him, even if it required the use of force.

Sadjek began to inquire if defendant had anything stronger than tinuate at his apartment. He wanted amphetamines, heroin, cocaine, or morphine. Defendant told Sadjek that he did have some morphine that was

inventory for the new pharmacy. Sadjek stated that he would like to buy the morphine on about five different occasions. Defendant would always alibi because he had no intention of selling the morphine.

On January 11, 1974, defendant again saw Sadjek at the tavern, this time accompanied by a man who he introduced as his brother. This man was Officer Kehoe. Defendant told Sadjek that he had no morphine for them. They told him that they still wanted it, and that he should bring it on the following Monday, January 14. Defendant agreed to do so, hoping again to "stall them off."

As they were leaving the tavern Sadjek told defendant that if he did not show up with the drugs he would break his legs. Defendant believed him and feared him. He considered going to the police, but worried that if he did and "they can't prove anything, I am certainly going to get my legs broken if he [Sadjek] catches me later on."

When defendant returned to the tavern on Monday he was still in fear of Sadjek. Defendant did not bring the morphine into the tavern with him because he still hoped to get out of the deal. He went through with the sale to avoid getting his legs broken. Defendant did not discuss money with Kehoe and Sadjek and he did not even know how much money Kehoe gave him.

Concerning the drugs in his apartment, defendant stated that he got them from stores that had closed, from other pharmacies, and that he had received some free as samples from certain salesmen. He stated that he had originally had receipts for these drugs; however, he could no longer find them after the police had been through his apartment. If such receipts were confiscated by the police they were never returned to him, although all of his other personal records were returned.

Defendant testified that all the drugs he had in his apartment were necessary in order to stock a pharmacy. Occasionally he would give or sell drugs to friends out of his apartment; however, with the exception of the January 14 incident, he never dispensed any of the scheduled drugs which were the subject matter of this indictment. Defendant denied that he stored drugs in a spice rack. Rather, he stated that the spice rack only contained bottles filled with vitamin tablets.

## Opinion

Initially, defendant contends that he was not proved guilty beyond a reasonable doubt of any of the four offenses charged. Specifically, as to the delivery charge, defendant raised the affirmative defense of entrapment (Ill. Rev. Stat. 1973, ch. 38, par. 7—12), and he argues on appeal that the State failed to prove beyond a reasonable doubt that he was not entrapped by Mario Sadjek, the police informer (Ill. Rev. Stat. 1973, ch. 38, par. 3—2(b)). We disagree.

■■ The law is clear that the defense of entrapment is not available where the police officers do no more than afford the defendant an opportunity to commit an offense which he was already predisposed to commit. (See *People v. Dollen* (1972), 53 Ill. 2d 280, 290 N.E.2d 879; *People v. Cazaux* (1969), 119 Ill. App. 2d 11, 254 N.E.2d 797; Ill. Rev. Stat. 1973, ch. 38, par. 7—12.) Whether entrapment exists is ordinarily a question for the jury's determination, which will not be disturbed on review unless the reviewing court concludes that entrapment existed as a matter of law. (*People v. Gulley* (1976), 36 Ill. App. 3d 577, 344 N.E.2d 567.) We can reach no such conclusion in the instant case.

■■ It is axiomatic that it is the jury's province, as the trier of fact, to draw inferences from the evidence and to determine the credibility of the witnesses and the weight to be given their testimony. (*People v. Mager* (1976), 35 Ill. App. 3d 306, 341 N.E.2d 389.) While we recognize that the State must be responsible for the actions of its informer when the defense of entrapment is raised (see *People v. Strong* (1961), 21 Ill. 2d 320, 172 N.E.2d 765), there was evidence in this case which, if believed by the jury, was sufficient to prove beyond a reasonable doubt that defendant was predisposed to make this sale, and that Mario Sadjek merely provided him the opportunity to do so.

First of all, the evidence showed that Sadjek and defendant first entered discussions concerning drugs during December of 1973. While defendant claimed at least a dozen contacts with Sadjek, Sadjek testified that he only started discussing drugs with defendant just prior to Christmas of 1973. Sadjek stated he only had three or four such discussions with defendant, and two of these were the January 11 and 14 meetings. In light of this evidence we cannot agree with defendant that this was necessarily a case where defendant was pressured over a period of months to make this sale. Rather, the jury could conclude that in a period of less than a month, during the course of only three or four meetings, defendant agreed to sell morphine to Sadjek.

This evidence also showed that defendant had agreed on a prior occasion to provide prescription drugs, such as tinuate, to Sadjek without a prescription. While defendant contended that he was merely stalling and never intended to deliver these drugs, the jury need not have believed this testimony. They could well have viewed this· as evidence of a predisposition to sell drugs illegally.

The fact that defendant never delivered the promised tinuate is not conclusive on this issue either. This was just more evidence to be considered and weighed by the jury. Indeed, it would be reasonable to infer that, having settled on a stronger drug during the course of their meetings, it was not necessary for defendant to supply the tinuate.

Secondly, the statements attributed to defendant during the January 11

and 14 meetings are hardly consistent with his assumed pose of one who was breaking the law unwillingly and who just wanted to rid himself of Sadjek and Kehoe. Officer Kehoe testified that on January 11 defendant apologized for not having the promised narcotics. He explained to Kehoe that he had been very busy at work and had been unable to find enough time alone to be able to get the drugs from the pharmacy. Defendant offered other drugs, or pills, to Kehoe which he had in his apartment, but the offer was refused. Kehoe stated that it was defendant who suggested they meet again on Monday to complete the original deal. In addition, both Kehoe and Sadjek stated that defendant on January 11 expressed fears that he might be dealing with police, and they had to dismiss these fears before he would continue with the transaction. The jury did not have to credit defendant's testimony that such actions and statements constituted attempts to get out of, or avoid, the deal.

Kehoe also testified that when the deal was completed on January 14 defendant stated that he did not know when they could deal again since "they know the stuff is missing already." In response to Kehoe's offer to return some of the drugs since he only had $1000 of the $1500 price, defendant said he trusted Kehoe. These statements are hardly consistent with defendant's claim that he was only dealing because of fear of Sadjek, and that he just wanted to get away from Sadjek and Kehoe as quickly as possible.

Defendant places heavy emphasis on his fear of Sadjek, especially in connection with his threat to break defendant's legs if he showed up on January 14 without the drugs. However, we note that the actual agreement to sell morphine to Sadjek was arrived at before any such threat was made. In addition, Sadjek testified that he said this in a joking manner, and that defendant merely responded by gesturing with his head. Lastly, the jury could well conclude from all the previously noted evidence that Sadjek's threat, even if not taken as a joke, was not the motivating factor behind defendant's sale of the morphine.

■■■ As evidence that he was not predisposed to commit this crime defendant points to the fact that he had never been arrested prior to this occurrence. However, while the past history of a defendant may be a relevant consideration in determining whether there has been entrapment, it is not controlling. (*People v. Washington* (1967), 81 Ill. App. 2d 162, 225 N.E.2d 673, *cert. denied* (1968), 390 U.S. 991, 19 L. Ed. 2d 1298, 88 S. Ct. 1190.) Neither is defendant's claimed reluctance to go through with this deal controlling on the question of entrapment. (*People v. Washington.*) His indication of fear and caution, while contradicted by the statements ascribed to defendant by Kehoe, even if taken at face value, could be found to exhibit no more than "the natural caution and hesitancy that could be expected from one engaged in the illegal narcotics

trade" (*People v. Washington* (1967), 81 Ill. App. 2d 162, 171, 225 N.E.2d 673, 677, citing *People v. McSmith* (1961), 23 Ill. 2d 87, 94, 178 N.E.2d 641, 645). We conclude therefore that the evidence was sufficient to support defendant's conviction on the delivery' charge beyond a reasonable doubt. The jury clearly disbelieved defendant's story that all his outward manifestations of a willingness to sell drugs illegally was part of a plan to string the buyers along and hope they would drop the deal. We cannot say that the jury erred in so doing.

Defendant also argues that he was not proved guilty beyond a reasonable doubt on the possession counts because the State failed to show that he did not possess the narcotics within the normal course of his business as a pharmacist. (Ill. Rev. Stat. 1973, ch. 56½, par. 1302(c)(5).) Once again we must disagree.

■■ Whether there was an unlawful possession of narcotics is a question of fact for the jury's determination; which determination will not be disturbed on review unless the evidence is so palpably contrary to the verdict, or so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of guilt. (*People v. Galloway* (1963), 28 Ill. 2d 355, 192 N.E.2d 370, *cert. denied* (1964), 376 U.S. 910, 11 L. Ed. 2d 608, 84 S. Ct. 665.) In this case, despite the testimony by defendant and Andrade concerning their projected opening of a pharmacy, the jury could well have concluded that defendant did not possess these drugs solely in anticipation of his new business.

Defendant's failure to produce receipts for these drugs, their unusual method of storage in his apartment, and the testimony by Sadjek that defendant obtained these drugs through a robbery militate against defendant's claims that he legitimately purchased these drugs for the equally legitimate and sole purpose of stocking his pharmacy. Likewise, the statements attributed to defendant by Kehoe concerning defendant's obtaining his drugs by stealing them from the pharmacy where he worked, and his offer to Kehoe of other drugs from his apartment, instead of the morphine, at the January 11 meeting weigh against defendant's contention. Lastly, the sale of January 14 itself is evidence that defendant was not in possession of drugs solely to stock his future pharmacy. In sum, then, we must conclude that the jury was justified in finding defendant guilty on the possession charges.

Defendant contends secondly that the State's cross-examination of Mario Sadjek prejudiced the jury and acted to deny defendant a fair trial. After the State had rested, and upon defendant's request, Sadjek was called as the court's own witness. On cross-examination of Sadjek, the prosecutor inquired as to a visit the witness had received, while he was in jail, from defense lawyers. The following exchange then occurred:

"Q. This gentleman right here, right? and when he came in to

visit you at the county jail he said, Mr. Kusner said, that he was your lawyer, didn't he?

A. He didn't tell me—

Q. Did you hear him say that to Mr. Euward, (phonetic spelling) the deputy warden there?

A. No, I didn't.

Q. Did you hear him say that he was there to take care of your problems?

MR. ZIMMERMAN [defense counsel]: I'll object to this.

THE WITNESS: Most certainly—"

Subsequently, during closing argument, the prosecutor made the following remarks concerning Sadjek's threat to break defendant's legs:

"And what was the force? After everything was arranged, Mario said and I think he even said it jokingly, although I'm not telling you to believe one single thing that man said. He's not my client, he's theirs.

MR. ZIMMERMAN: Objection.

THE COURT: The jury should recall Mario Sadjek was the Court's witness."

Defendant now argues that these exchanges improperly insinuated defense counsel impropriety such that defendant was denied his right to a fair trial. Our response is four-fold.

■■ First of all, we do not believe that these questions by themselves insinuate impropriety by defense counsel. Indeed, the first language which raises the question of impropriety was uttered by defense counsel himself.

"MR. ZIMMERMAN: Well, if there's an inference or insinuation that's going to be made, let it be direct.

MR. NORRIS [prosecutor]: We object to counsel's speech.

MR. ZIMMERMAN: Trying to put words in his mouth when they accuse me of doing it doesn't seem quite apropos at this point, when he's asking for yeses to question, to quote his objection. An objection which isn't legal; but, in any event, it constitutes an objection. If there's an allegation of impropriety, let's make it. If they want to accuse me of doing things wrong, let them do it. I'll be glad to explain anything."

Up to this point, there was no indication that this line of inquiry was intended to show that defense counsel had acted improperly in any manner. Rather, it seems entirely possible that the State was merely attempting to establish any possible bias or prejudice the witness might have to favor defendant. The State might have gone on to inquire whether Sadjek's meeting with, and obtaining as his own counsel, defendant's lawyer influenced his feelings toward defendant; whether he

was now more disposed to befriend defendant and help him out. Generally, a prosecutor is accorded wide latitude in determining if such bias exists. See *People v. Jones* (1975), 60 Ill. 2d 300, 325 N.E.2d 601; *People v. Franklin* (1976), 42 Ill. App. 3d 408, 355 N.E.2d 634; 37 Ill. L. & Prac. *Witnesses* §§201, 204, 205 (1958).

Secondly, we note that in response to defense counsel's objection, the court made the following statement:

> "This is not the form for improprieties. The attorneys in this matter—I would ask that the state's attorney confine his questions to the witness to this matter to those matters relating to the principal issues of the case. Thank you."

Effectively, therefore, the court sustained counsel's objection, and thereafter the State immediately dropped this line of inquiry.

Thirdly, defense counsel upon re-cross-examination effectively negatived any remaining inference of impropriety. He elicited testimony from Sadjek that while they had discussed his appearance as a witness, counsel never made Sadjek any promises and never told him to do anything but tell the truth.

On these facts then, we hardly can conclude that defendant was denied his right to a fair trial because of the questions propounded by the State during cross-examination of Sadjek. Likewise, we cannot conclude that the closing commentary by the State that Sadjek was "their witness" emphasized this previous inquiry and raised it to the level of prejudicial error. The court immediately reminded the jury that Sadjek was the court's witness, thus curing the error made by the prosecutor. See *People v. Franklin.*

Lastly, we would note that even assuming *arguendo* that error occurred in this regard which was not cured by the actions of the court and defense counsel combined, we fail to see how it would prejudice defendant's case. Sadjek's testimony was more supportive of the State's case than the defendant's in our view. While Sadjek did testify that he threatened defendant, he claimed to have done so "jokingly." Impeachment of Sadjek in this manner, therefore, even if improper, would not prejudice the defense.

Defendant also claims that the State improperly cross-examined Sadjek concerning his mental condition. Specifically, the complained-of exchange occurred following the elicitation of testimony that Sadjek had a Federal case pending against him. The State inquired as to what his defense was in that case.

> "THE WITNESS: My defense in that case is that I did not sign any contracts with any of the people.
>
> Q. Mr. Sadjek, is it not true that your defense is that you are insane?

MR. ZIMMERMAN: Objection.

MR. SCHAFFNER [prosecutor]: Is that not your defense?

THE WITNESS: That is not the defense.

MR. SCHAFFNER: Sir, are you not scheduled to see Dr. Vernon Tutor (phonetic spelling)?

MR. ZIMMERMAN: Objection.

MR. SCHAFFNER: At the Elgin State Mental Hospital?

THE WITNESS: The petition was pulled.

THE COURT: Objection sustained."

A side-bar conference was held during which defense counsel indicated his objections to the State's inquiry "about insanity." Thereafter, the court instructed the jury as follows:

"Ladies and gentlemen of the jury, the last statement of the state's attorney, subsequent to the last answer of this witness, that material which the state's attorney was seeking to elicit from the witness in this case, will be stricken. And the Court is instructing you to disregard any of the material which was contained in the statement by Mr. Schaffner prior to the—just prior to the side-bar discussion."

■■ In light of these facts, we conclude that defendant's claim of prejudice in this regard must be rejected. While there may be some question as to whether testimony concerning the witness' alleged insanity defense could properly be elicited in this manner and used to impeach his credibility (see *People v. Lambersky* (1951), 410 Ill. 451, 102 N.E.2d 326; *People v. Nash* (1966), 36 Ill. 2d 275, 222 N.E.2d 473, *cert. denied* (1967), 389 U.S. 906, 19 L. Ed. 2d 223, 88 S. Ct. 222; *People v. Chupich* (1973), 53 Ill. 2d 572, 295 N.E.2d 1; see also *People v. Schuemann* (Colo. 1976), 548 P.2d 911), we need not determine this issue in this particular case. Any possible error in this regard was cured in the instant case by the actions of the court in sustaining the objection and instructing the jury to disregard this testimony. See *People v. Noblin* (1973), 15 Ill. App. 3d 1060, 305 N.E.2d 658; *People v. Johnson* (1973), 11 Ill. App. 3d 745, 297 N.E.2d 683.

Furthermore, even if not cured, any alleged error in the prosecutor's questions can only be viewed as harmless. As noted earlier, impeachment of Sadjek would not necessarily adversely affect defendant's case, as much of his testimony was not consistent with defendant's claim of entrapment. Furthermore, in view of the entire record, we cannot say that the jury would have reached a contrary verdict had these remarks not been made. The evidence of guilt was clear and sustained by Kehoe's testimony and by defendant's own actions. We do not believe that the cross-examination of Sadjek by the State played a material part in the jury's rejection of defendant's explanation for why he acted as he did, and

accordingly, we refuse to disturb the jury's verdict on this basis. See *People v. Franklin.*

Defendant's third contention is that the trial court erred in not granting his motion to sever the delivery count from the possession counts. We disagree.

Initially, we note that defendant did not present his motion to sever until just prior to opening statements in the case, after the jury had been selected and sworn. By not objecting to his indictment prior to trial, therefore, defendant has waived his claims of misjoinder. *People v. Van DeVeire* (1977), 47 Ill. App. 3d 289, 361 N.E.2d 1180; see also *People v. Hoover* (1976), 35 Ill. App. 3d 799, 342 N.E.2d 795.

■■ Defendant argues that exigent circumstances excused the fact that his motion was untimely. He explains to this court, as he did to the trial court, that defense counsel's personal file on the case was stolen and that counsel had mistakenly believed that he had earlier filed the motion on time. However, as noted by the trial court, counsel had access to the indictments since the time this case had been assigned to that courtroom. Furthermore, if counsel thought he had made a timely motion to sever, then prior to jury selection it would have been proper to request the court to rule on it. In any event, it would be clear that as jury selection was about to start, some action should be taken concerning a severance, if one was desired. Therefore, we cannot conclude that defendant was excused from filing a timely motion.

■■ Secondly, we believe that even considering the merits of this contention, the court did not err in refusing to sever these offenses. The law is that separate offenses may be joined in a multiple-count indictment if they are part of the same comprehensive transaction. (Ill. Rev. Stat. 1973, ch. 38, par. 111—4(a); *People v. Van DeVeire.*) The general tests in this regard have been whether the offenses were of a similar nature or were part of a single transaction or common scheme. See *People v. Key* (1975), 28 Ill. App. 3d 637, 328 N.E.2d 914; *People v. Bricker* (1974), 23 Ill. App. 3d 394, 319 N.E.2d 255; Ill. Ann. Stat., ch. 38, par. 111—4, Committee Comments (Smith-Hurd 1970).

■■ In this case, the evidence showed that defendant offered at the January 11 meeting with Kehoe to substitute other drugs from his apartment for the morphine which he had been unable to obtain at work. He told Sadjek that he had obtained the drugs in his apartment in connection with a robbery, and he told Kehoe that he obtained drugs to sell by stealing from the pharmacy where he worked. Defendant could produce no receipts for the drugs which he possessed and had promised on prior occasions to deliver such drugs as tinuate to Sadjek. Lastly, on the date of the sale defendant, before going to the tavern, had to first stop at

his apartment in order to get the morphine for Kehoe. Thus, we conclude that these facts sufficiently evidence defendant's scheme to sell narcotics which he had illegally possessed and accumulated in his apartment. These offenses were therefore properly joinable.

Defendant's fourth contention is that the trial court erred in allowing Sadjek to testify concerning the alleged source of defendant's drugs. During the State's cross-examination of Sadjek the prosecutor inquired as to whether defendant had told Sadjek where he got the narcotics stored in his apartment. When Sadjek responded that defendant had not gone into specifics, the prosecutor asked him to refresh his memory by examining a copy of a statement he had earlier given to the police. The following colloquy then occurred:

"Q. I'll show it to you, sir, and you can look through it. Take a look. Just look at the top of page 2, perhaps, we can save time.

Do you recall whether or not the defendant told you where he got the narcotics from?

A. Now that I see it in black and white, yes.

Q. This is your statement, is it not?

A. Yes, that's my statement.

Q. What did he tell you?

A. He told me that there was a robbery.

MR. ZIMMERMAN: Objection, if the Court please. We would ask for a side-bar for a second."

During the side-bar the court ruled that this line of questioning was proper, over defendant's objection, although it advised the State that the material "at the top of page 2" of the statement was not "relevant to this trial." The State then withdrew its question and pursued a different line of inquiry.

Defendant now argues that the testimony by Sadjek was improper because there was no clear proof that he was testifying from his own independent knowledge. We disagree, and conclude to the contrary that the record sufficiently reflects that Sadjek properly refreshed his exhausted memory and then testified from his own recollection.

It is well settled that a witness may refresh and assist his memory by use of a written memorandum when he is unable to remember relevant facts. (*People v. Van Dyk* (1976), 40 Ill. App. 3d 275, 352 N.E.2d 327.) A witness may refresh his memory by reference to a memorandum even though the writing was not prepared by the witness and even though the writing is not independently admissible into evidence, provided that, after inspecting it, the witness can speak to the facts from his own recollection. *People v. Van Dyk.*

■■ Apparently, that portion of the written statement referred to in this

case indicated "there was a robbery and cocaine was missing and he [defendant] sold cocaine on the street." While the evidence concerning cocaine was not relevant to the issues in this case, it could properly serve to refresh Sadjek's recollection. Sadjek did not read directly from the report. Indeed, he stated that after reviewing his statement he was then able to "recall" defendant telling him where he obtained his narcotics. These facts are a sufficient basis upon which to conclude that Sadjek testified from his independent memory.

■■ However, we note that the State in the end withdrew its question, in response to the court's indications that the material used to refresh was not relevant to the case. Thus, even assuming that Sadjek did testify improperly, no prejudice resulted. The jury was instructed by the court in the normal manner that it should disregard questions which were withdrawn. (Illinois Pattern Jury Instructions, Criminal, No. 1.01.) We must presume the jury followed the law and correctly acted upon the instructions given.

Furthermore, we cannot conclude that the response by Sadjek concerning a robbery was so prejudicial that its effect on the jury could not be overcome by the court's instruction. While defendant argues that this evidence prejudiced him by tending to rebut his defense that he had obtained these drugs to open a pharmacy, there was sufficient other evidence in the record which also rebutted this defense. Kehoe testified that defendant told him he stole drugs from work; defendant's statements on January 11 and 14 indicated he obtained the morphine at work, and that he did not know when they could "deal again" because the absence of the morphine had already been discovered; and defendant could produce no receipts for any of the drugs he possessed. Thus, there was ample evidence in the record, in addition to the complained-of testimony by Sadjek, to indicate that defendant obtained his drugs illegally, and not for the sole purpose of opening a new pharmacy.

Defendant contends fifthly that the sentence of 4 to 12 years on the possession of amphetamine offense was improper. He argues that the proofs failed to show that the amphetamine taken from his apartment amounted to 200 grams or more. Thus, he should only have been sentenced for a Class 3, rather than a Class 1, felony. (Ill. Rev. Stat. 1973, ch. 56½, pars. 1402(a)(6) and (b).) We agree.

This court has carefully reviewed the testimony of Robert Boise, the police chemist, with reference to the drugs seized at defendant's apartment. During Boise's testimony reference was had to People's Group Exhibit No. 17. From our reading of the record it appears clear that No. 17E consisted of a bag which contained empty vials. These vials formerly contained the pills which Boise tested. The pills themselves comprised the

remaining exhibits in the group: Nos. 17A, 17C and 17D all contained barbiturates, and were composed of blue and red capsules (17D), red capsules (17C) and white and yellow capsules (17A). The orange capsules (17B) were the amphetamines, while the demerol was contained in exhibit No. 17F. Boise testified as follows:

"Q. Mr. Boise, you mentioned earlier in your testimony you had occasion to weigh these capsules which are barbiturate acid.

A. Yes.

Q. What are the weights of those matters, do you know?

A. From what I can recall this one here contains Two Hundred and Ninety Grams.

Q. In other words, the total weight of the capsules were Two Hundred and Ninety Grams?

A. The total weight of the red capsules were Two Hundred and forty-seven grams and the yellow and white ones was One Hundred and Five grams."

He also testified specifically as to the contents of the orange pills (amphetamine) and stated that the demerol was less than 100 grams. However, no specific reference was made to the weight of the amphetamine pills.

The State argues that Boise's testimony concerning one exhibit of 290 grams must have, by process of elimination, referred to the amphetamines. We disagree. Clearly, Boise was responding to the State's specific query concerning the weight of the capsules containing barbiturates. He stated the weights of the red pills (17C) and the white and yellow pills (17A) as, respectively, 247 grams and 105 grams. Thus, his earlier reference to "this one here" as weighing 290 grams can only refer to blue and red capsules (17D), which was the third exhibit containing capsules with barbiturates. This reading of the record is further substantiated by the fact that no mention had yet been made of the orange amphetamine capsules when Boise made his statement concerning an exhibit of 290 grams.

We also disagree with the State's contention that the jury was in a unique position to judge the weight of each exhibit. No testimony was elicited concerning the weight of the orange capsules relative to the other capsules, and we have no indication that the number of orange pills was particularly large. Neither does it appear that the jury was allowed to physically handle the exhibits and compare their relative weights.

■■ Thus, we must conclude that the record is insufficient to support a finding that defendant possessed 200 grams or more of amphetamines. However, the evidence clearly supports a finding that defendant illegally possessed less than 200 grams of amphetamine. We therefore exercise our

powers in accord with Supreme Court Rule 615(b)(3) and (4). (Ill. Rev. Stat. 1973, ch. 110A, pars. 615(b)(3) and (4).) We reduce defendant's conviction on this count to the lesser-included offense of possession of a controlled substance consisting of less than 200 grams of amphetamine. Where this court exercises its power to reduce the degree of an offense and finds a defendant guilty of a lesser-included offense, it may in addition reduce the sentence imposed by the trial court. (*People v. Nance* (1975), 26 Ill. App. 3d 182, 324 N.E.2d 652; *People v. Taylor* (1972), 3 Ill. App. 3d 313, 278 N.E.2d 469; *People v. Hayes* (1971), 133 Ill. App. 2d 885, 272 N.E.2d 423.) Therefore, we reduce the sentence imposed on defendant for this offense to a term of 1 to 3 years, which sentence is consistent with the other sentence imposed on defendant by the trial court for a Class 3 felony; *e.g.*, the possession of demerol count.[1]

Finally, defendant contends that the maximum sentences of 12 years imposed on two of the possession counts were excessive. In view of our earlier action concerning defendant's conviction on the amphetamine count, however, we need only consider this contention in relation to the possession of barbiturate offense.

The law is well settled that the imposition of a sentence is a matter of judicial discretion and that, absent an abuse of this discretion, the sentence of the trial court may not be altered upon review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) The trial judge is normally in a better position to determine the punishment to be imposed than are courts of review. (*People v. Perruquet.*) In this case, we can find no abuse of discretion.

The trial judge in the case at bar was well aware that defendant had no prior criminal record, that he had spent many years in schools of higher education, that he lived with his parents, and that he would be barred from his chosen profession because of these convictions. However, likewise it was clear that this offense, being a Class 1 felony, was very serious. The amount of drugs involved was far from minimal, and the overall evidence revealed a scheme by defendant to obtain and sell drugs illegally. Defendant in this case was not merely a "runner" or "petty distributor" for these drugs. (Compare *People v. Pinchott* (1977), 55 Ill. App. 3d 593, 370 N.E.2d 1289, with *People v. Pinchott* (1977), 55 Ill. App. 3d 601, 370 N.E.2d 1294.) Rather, he was the originator of the scheme; a registered pharmacist who used his position and license to obtain drugs with which to break the law.

Furthermore, we find that the court's sentence reflected both the proper

---

[1] Defendant is not eligible to elect a determinate sentence for this offense under the recently amended Unified Code of Corrections. Ill. Rev. Stat. 1977 (Supp.), ch. 38, par. 1008—2—4(b).

spirit of the law in allowing for the rehabilitation of defendant, as well as some leniency in light of his lack of a prior criminal history. Prior to the recent adoption of determinate sentencing in Illinois (Ill. Rev. Stat. 1977 Supp., ch. 38, par. 1005—8—1), it had been suggested that the courts, in setting indeterminate sentences, should be guided by the general principle that the minimum term be no more than one-third the maximum; this, so as to allow the Parole and Pardon Board[2] to release the defendant at the best time for all concerned. (See *Abernathy v. People* (1970), 123 Ill. App. 2d 263, 259 N.E.2d 363.) Since the lowest minimum sentence possible for a Class 1 felony at the time of this conviction was 4 years (Ill. Rev. Stat. 1975, ch. 38, par. 1005—8—1(c)(2)), it follows that the maximum term under the one-third guideline would be 12 years.[3]

■■ In light of all these facts, therefore, we can hardly conclude that the trial court abused its discretion in setting a maximum term of 12 years for this offense.

For the reasons stated, the judgment of the trial court as to the possession of amphetamine is modified to adjudge defendant guilty of the illegal possession of less than 200 grams of amphetamine, and the sentence thereon is reduced to a term of not less than one year and not more than three years. As modified, all of the judgments herein are affirmed.

Judgments affirmed as modified.

SULLIVAN, P. J., and WILSON, J., concur.

---

[2] The Parole and Pardon Board has been abolished and replaced by the Prisoner Review Board. Ill. Rev. Stat. 1977 Supp., ch. 38, par. 1003—3—2.

[3] Under the present Unified Code of Corrections defendant will apparently have the option of accepting a fixed release date from the Prisoner Review Board or remaining eligible for parole. Ill. Rev. Stat. 1977 Supp., ch. 38, pars. 1003—3—2.1, 1003—3—3.