THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JACK HUSTED, Defendant-Appellant.

Second District    No. 79-608

Opinion filed June 10, 1981.—Rehearing denied July 22, 1981.

Van R. Richards, Jr., of Geister, Schnell, Richards and Brown, and Richard W. Husted, both of Elgin, for appellant.

Robert Morrow, State's Attorney, of Geneva (Phyllis J. Perko and John X. Breslin, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant was indicted on December 26, 1978, in Kane County for the December 3, 1978, unlawful delivery of more than 30 grams of a

substance containing cocaine, a controlled substance. (Ill. Rev. Stat. 1979, ch. 56½, par. 1401(a)(2).) Defendant pleaded not guilty and raised the affirmative defense of entrapment. (Ill. Rev. Stat. 1979, ch. 38, par. 7—12.) A jury found him guilty of the offense charged, his post-trial motion was denied, and he was sentenced to the Department of Corrections for six years, the minimum term permitted for this Class X felony.

The defendant asserts that he was denied a fair trial due to the trial court's refusal to allow him to testify about conversations he had with the State's informer whereby he was entrapped into committing the offense. He further asserts reversible error occurred as the result of the prosecutor's closing argument, and in permitting the testimony of a purported character rebuttal witness. We affirm.

The record disclosed the following sequence of events. In early October of 1978, the defendant made the acquaintance of Eugene "Big Mac" McWethy at a bar, at which time defendant gave him his home address. In mid-October, McWethy visited the defendant at his house and they had a conversation of several hours' duration. The court sustained the State's hearsay objection to the contents of the conversation and no offer of proof was made. The defendant next saw McWethy on October 31, when McWethy brought John Burns, a special agent of the Illinois Department of Law Enforcement, to meet him. The circuit clerk testified McWethy had been charged by information several days prior to this time on October 25 with unlawful possession of cannabis and theft, and that he had been released on October 30 on a recognizance bond. The clerk also testified McWethy's case was continued four times, once at defendant's request, once by agreement, and twice on motion of the State, and that a warrant for his arrest was issued on April 4, 1979. It was stipulated by the parties that the clerk's file on McWethy was true and correct.

Burns represented himself to be a "ramp rat" (a luggage handler) for Northwest Airlines. He asked the defendant if he had any cocaine and if he would sell him any. Defendant denied he had any cocaine, was in the business, or wanted to get into the business. McWethy then engaged the defendant in a 10-minute conversation outside the presence of Burns, the content of which was objected to as hearsay and sustained. No offer of proof was made. Burns renewed his request for cocaine, and the defendant repeated he did not have any and was not interested in getting any. Defendant testified he had never seen, tried or sold cocaine or any other drug in his entire life until he was entrapped into dealing with John Burns. Burns told defendant he would be able to get a new car and change his lifestyle if he got into the business. Burns and McWethy said they would be in touch, and McWethy telephoned the defendant a couple of hours later during the afternoon of the 31st. The State's hearsay objection

to that conversation was sustained. No offer of proof was made. Burns and McWethy arrived at defendant's house shortly after the call, and Burns renewed his request for cocaine. McWethy motioned to the defendant to leave the house with him, and the defendant drove with McWethy to McDonald's in Dundee in the defendant's car. The defendant exited the car, and McWethy left with the car, saying he would go get the cocaine and scale. Defendant testified that in one of the earlier conversations that was not admitted by the trial court, McWethy had told him that he would make "$75.00 that day real easy." McWethy returned to McDonald's, gave defendant a bag saying it was a quarter ounce of cocaine and that he wanted $475 for it. McWethy also had a brown suitcase with him which contained a scale and various paraphernalia. The defendant testified McWethy instructed him how to use the scale and how to deal with Burns. They returned to defendant's house; two other persons were present there with Burns, one of whom was nicknamed "Rocky." The defendant testified Rocky had recently sold him a Doberman Pinscher, that he still owed him $100 for it, and that he went upstairs with Rocky for about five minutes because he was embarrassed to have a creditor there in front of the others.

The defendant's position at trial was that McWethy supplied him with the drugs that he was to sell. McWethy did not appear at trial in order to rebut the defendant's testimony. The State maintained that it did not know McWethy's whereabouts, and that no one except the defendant ever saw or heard from McWethy after the October 31 transaction. The State further maintained that Rocky conceivably was the defendant's source, since Rocky co-incidentally was present at the October 31 sale and at a later sale on November 15.

After Rocky left, the defendant and Burns went upstairs, where the defendant weighed the bag as instructed. Burns tested the substance by wetting his index finger and dipping it into the powder and then rubbing it between his upper lip and gum, and the defendant followed suit. Burns declared it was "good coke," and paid the defendant $550 for the bag which had weighed close to seven grams. Burns said he would be in touch because he would want to "cop" (procure) some more. Downstairs and out of Burns' presence, defendant handed the $550 to McWethy who gave him back $75. Before he and McWethy left, Burns chided the defendant for having a junk car and a "shack" house, noting that defendant would be in the money and his life would change if he kept on selling drugs. The defendant explained he did not have much money because he was just beginning to sell Amway products, and did not have a large clientele yet. He supplemented his income by working part-time as a waiter, and frequently borrowed money from his mother. The defendant denied ever

stating to Burns that he could "do" a couple of ounces the next week or that "with a little notice" he could get Burns a quarter of a pound of cocaine.

The defendant received a phone call from Burns a few days or a week after October 31, asking defendant to sell him another quarter ounce. He continued to call every day for about a week. McWethy then telephoned the defendant on November 13 and they had a conversation, the subject of which was the quarter-ounce McWethy could deliver to him the next day. The State's hearsay objection to this conversation was sustained, and no offer of proof was made. When Burns called November 14, the defendant told him he thought he could get the cocaine for him. He explained he expressed no reluctance about securing the cocaine because McWethy had already delivered the quarter-ounce to him and he had temporarily stored it in an old refrigerator in a horse barn at his parents' home. The defendant explained that he put the cocaine there so that no one would accidentally find it at his house. He said he had allowed McWethy to bring him the cocaine because he succumbed to McWethy's suggestions of the amount of money he could make by selling drugs. McWethy stated he wanted $475 for the quarter-ounce, and cautioned the defendant against "messing up" on the money. He suggested that he take a little of the cocaine out of the bag and replace it with baking soda so he would be able to have a little for himself and still make $75. The defendant testified that he did do this.

At approximately 9 p.m. on November 15, Burns came to the defendant's house and was ushered upstairs where he and the defendant performed the testing ritual once again. Burns complained about the quality and refused to pay $550. They haggled about the price and at one point Burns told the defendant that a two-ounce transaction would be more profitable, and that Burns had a ready market in Madison, Wisconsin, "crying for it." The defendant testified Burns spent 15 to 20 minutes trying to convince him to make a two-ounce sale. Defendant then agreed to accept $530 and threw in the separate small package of cocaine that he had previously removed from the quarter-ounce bag.

Burns testified contrarily that the defendant had offered him a discount on the transaction since the defendant did not have the cocaine when he first arrived at 9 o'clock because Rocky, the defendant's source, was running late. Special Agent Petersik, who was observing the exterior of the house, testified that two male subjects and a female arrived and entered the house sometime after 9:30 p.m., and that Burns emerged with one small and one larger bag about 10 minutes after the female had come back out to the car, appeared to be looking for something there, and then re-entered the house. Burns testified the small package was given to him by the defendant as a sample of the kind of "killer coke" the defendant

could get for him. Burns also testified that while he and the defendant were waiting for Rocky to arrive, the defendant received several telephone calls. After one such call, the defendant took out of the closet a small-size plastic garbage bag containing a leafy green substance that smelled to Burns like marijuana. Burns said the defendant divided the substance between two smaller bags while explaining to Burns that he wished to get out of the marijuana trade and get into cocaine exclusively, but that he had only four regular cocaine customers and couldn't make enough money with such a limited clientele. The defendant left the room with the two bags to answer a knock at the door downstairs, and returned upstairs without the bags. Agent Petersik testified that about six or eight cars came to and left the house during the time Agent Burns was inside.

Burns' testimony reflected that when Rocky arrived with a female and another man shortly after 9:30, Burns was asked to go downstairs while Rocky and the two others went upstairs. Burns testified the female came back downstairs, went outside, and then came back into the house. She talked with him for a few moments about the dog, and someone hollered to her from upstairs, whereupon she handed something from her pocket to someone on the stairs. The defendant testified that he still owed Rocky $100 for the dog at that time; the defendant opined that Rocky's girl friend was embarrassed by the debt discussion, and she went downstairs to get a pack of cigarettes and go to the bathroom.

The defendant denied he had any cocaine customers or ever sold or gave away any marijuana except to the extent he had infrequently smoked and then passed on a marijuana cigarette to someone else. The pre-plea report prepared by an adult probation officer after an interview with the defendant, who was described as having been "very open and honest," reflected the defendant used marijuana with his friends one to three times per month and used cocaine one to two times a week up until January of 1979. At trial, the defendant testified he never used cocaine before he met Burns on October 31, and that he never heard the expression "coke" until McWethy and Burns used the term. During rebuttal, a witness called by the State, Detective Donahoe of the Carpentersville Police Department, testified to a conversation he had with the defendant during June or July of 1977. During the conversation, the defendant expressed a desire to inform on persons in Elgin who he believed were dealing in drugs. He said he knew a lot about drugs because he had spent five or six thousand dollars of his parents' money on drugs when he was away at school, and that he had used and sold all kinds of drugs. On surrebuttal, the defendant denied he knew anything about drugs, and that during his conversation with Detective Donahoe he admitted he used marijuana occasionally but knew nothing about any hard drugs.

The defendant testified he next heard from Burns about a week after the November 15 transaction and that Burns wanted to "cop" (buy) a two-ounce amount of cocaine. Defendant said he told him he "didn't have any," "didn't want to get in on this level," "didn't know if [he] could get any even if [he] wanted to," "wasn't pleased with the business," and "it made [him] nervous." Burns told him he could make a lot of money, could get a nicer car, and should not worry because it would be safe. Another week passed and Burns began to call every day for about three consecutive days. The first two days' calls were repeats of his entreaty to sell him two ounces of cocaine. The third call, late on November 24, was to tell the defendant he had to go out west to attend his girl friend's funeral. The defendant had seen McWethy the day after the November 15 transaction when McWethy came to collect his $475. McWethy next called the defendant the morning of November 24 about an ounce of cocaine he could deliver to the defendant the next day.

The defendant then offered to prove through the testimony of Eugene McWethy, that on October 31, 1978, and on numerous other times thereafter, McWethy repeatedly entreated Jack Husted to get into the business; that he could furnish him the narcotics; that they would both make a lot of money; that the defendant would not have to live in an old house, drive an old rattle-trap car, or be without spending money. The defendant argued that the conversations were offered to show they occurred and not to prove the truth of the matter asserted and, thus, were not hearsay. The court ruled the conversations were not admissible.

McWethy arrived at the defendant's house shortly after the phone call on November 24 and gave him a bag containing an ounce of cocaine. They tested it, and McWethy said he wanted $1800 for it and cautioned the defendant against "messing up" the money. The defendant testified McWethy made no threats that day, but did at later times. Defendant again stored the cocaine in his parents' horse barn refrigerator where it remained until December 3.

Burns next called on about November 29, and McWethy called every day between the 24th and December 2. A hearsay objection which was sustained cut off defendant's attempt to relate a threat made by McWethy. No offer of proof was made. Defendant testified his reaction to McWethy's phone calls was that he feared for his life, became nervous and frightened, paced around the house and perspired quite a bit. Defendant asked McWethy to take the ounce of cocaine back, and stated he thought he would get hurt if he did not get the money McWethy demanded for the ounce. The defendant testified he had nowhere to sell the cocaine except to Burns, that part of his motivation for going through with the two-ounce sale was his anticipated $1600 profit, and that he was always contacted by Burns, never the other way around.

When Burns called on November 29, the defendant told him he thought he could get the two ounces for him. The defendant could not recall exactly why the sale was postponed until December 3, but he thought it was because he had to work on November 30, December 1 and 2. Burns called the defendant on December 2 and reiterated the defendant's potential for profit by selling drugs, and urged him to relax because everything would go smoothly. The defendant testified he called his married sister, Isabel "Bunny" Hughes, on December 2 to ask her to keep a good thought for him and to pray for him because he was frightened for his life and certain people—whom he did not name—were making him do something he did not want to do. He told her he had been threatened to be maimed and have his limbs broken, and that he "wouldn't see 1979." He did not tell her the exact cause of his fright. Mrs. Hughes was called as a character witness and corroborated the fact of the phone call.

On December 3, the defendant retrieved the one-ounce of cocaine from his parents' horse barn and, upon the earlier telephone instructions of McWethy, he mixed it with enough baking soda to make two one-ounce bags. When Burns arrived on December 3, the defendant admitted him to the house; defendant's roommate, Jeff Becker, was asleep in the downstairs bedroom, and a friend of Becker's, Jay Kennedy, was asleep in the downstairs living room. Burns tested the substance, and the defendant weighed out the bags at about 28 grams each. Burns then gave the defendant $3400 which was the price the defendant stated Burns had offered and he had accepted during an earlier phone conversation. Becker walked into the room at this point, and since Burns had asked the defendant to go outside to meet someone, the defendant gave the money to Becker, asked him to hide it for him for awhile, and told him he knew how much was there, so he should "just put it away." Burns and the defendant walked outside, the defendant was introduced to Special Agent Petersik and was arrested.

Other agents appeared on the scene, and defendant stated their behavior was as though they had just won a football game; they were running, screaming, hollering, laughing and smiling, and holding guns to his body. The agents re-entered the house with the defendant in tow and recovered the $3400 from Becker at gunpoint from beneath some loose carpet squares in his bedroom. The defendant testified one of the agents put a gun to Kennedy's head and cautioned him that if he said one word about what had happened that there were other people around who would set him up just like they had the defendant. Pictures of the defendant's house taken one or two days after his arrest were admitted into evidence. They depicted disarrayed furniture and clothes strewn about, chunks of plaster missing, and smashed and unhinged entry doors, and a broken entry door frame. A rebuttal witness called by the State,

Elgin Police Department Detective Copher, testified he had observed no agents smashing or tipping over furniture or knocking plaster off the walls. When he and the other agents first entered the house immediately after the arrest, he observed it to be somewhat in a disarray, clothes strewn about, etc. He did note that the west entry door frame was knocked loose and the door was ajar when he entered. He stated that to his knowledge, only one uniformed officer had a shotgun with him at the time of the arrest.

The State first argues the defendant has waived consideration of the hearsay issue because he failed either to make an offer of proof or to make a proper offer of proof after the court sustained the objections to the conversations in question. The State points out the one offer of proof which was made was framed in terms of what McWethy's testimony would be rather than what the defendant's testimony would be. The State further argues that even if evidence of the alleged conversations was improperly excluded, such error is not reversible or prejudicial when substantially the same evidence is received at some other stage of the trial. *People v. Saltz* (1979), 75 Ill. App. 3d 477; *People v. Limas* (1977), 45 Ill. App. 3d 643.

■■■ We do not agree that the defendant has waived consideration of this issue due to his failure to make offers of proof in each instance of an excluded conversation, or by virtue of the irregular form of the offer of proof he did make. The exclusion of an alleged hearsay conversation which is integral to the defendant's theory of defense has been held to deny the defendant a fair trial. (See *People v. Canamore* (1980), 88 Ill. App. 3d 639.) As such, the error asserted would be cognizable as plain error. (Ill. Rev. Stat. 1979, ch. 110A, par. 615(a).) Further, an offer of proof is not required when the evidence sought to be admitted is obviously material and relevant. (*People v. Christen* (1980), 82 Ill. App. 3d 192.) No doubt the trial court was aware of what the defendant was trying to establish by the excluded conversations, and its exclusion of McWethy's out-of-court statements on and after October 31 was error because such statements were not hearsay. They were not offered to prove that the narcotics business is a lucrative one, but to show the effect McWethy's statements had on the defendant's actions. Further, defendant's post-trial motions specifically charged error in the court's exclusion of the October 31 conversation between McWethy and the defendant. Consequently, we believe the error has been adequately preserved for review.

■■ Despite the court's erroneous exclusion of this evidence, however, we agree with the State that the error does not mandate reversal under the facts of this case. First, as suggested by the State, the evidence excluded which would have had a bearing on the defendant's entrapment defense

was more than substantially presented to the jury during the course of the trial. (*People v. Limas* (1977), 45 Ill. App. 3d 643; *People v. Moretti* (1955), 6 Ill. 2d 494, 529.) The defendant testified extensively to the entreaties made to him by Burns which contained the same inducements as those apparently made by McWethy as set forth in one offer of proof the defendant did make as to McWethy's testimony. These alleged inducements were primarily more money, a nicer car, and improved living quarters. Further, the jury heard the defendant testify McWethy supplied him with the cocaine to sell to Burns. Although McWethy did not testify at trial in order to rebut the defendant's testimony that the State through its agent, McWethy, supplied the illegal substance, there was contrary testimony received from Agent Burns during the State's case-in-chief that Rocky was the defendant's source. (*Cf. People v. Lenair* (1979), 77 Ill. App. 3d 870, 872 (testimony during case-in-chief of special agent which effectively denied she supplied defendant with drugs held sufficient to resist defendant's claim on appeal there was a "take back" entrapment as a matter of law because the special agent was not recalled on rebuttal).) Several prior cases had held that the failure of the informer to testify in order to rebut the evidence that he supplied the drugs was reversible error, but the rule now is that the fact the government supplied the drugs is only one of the factors to be considered when the entrapment defense is raised. (*People v. Cross* (1979), 77 Ill. 2d 396, overruling in part *People v. Dollen* (1972), 53 Ill. 2d 280, and *People v. Strong* (1961), 21 Ill. 2d 320.) Additionally, it was quite clear that McWethy was not available to testify because his whereabouts were unknown and an arrest warrant had been issued about six months prior to the trial. Since McWethy's absence was explained, no inference against the State may be said to have arisen for its failure to present McWethy as a witness. (See, *People v. Cross*, cited above.) Finally, during the defendant's testimony regarding his December 2 phone call to his sister, the jury heard of the alleged threats made to the defendant that he would be maimed, have his limbs broken, and "not see 1979." In view of the substantial testimony the jury received despite the excluded conversations, we determine that evidence of the defendant's conversations with McWethy would have been cumulative at best.

■■ Additionally, we believe the error is not reversible because the evidence shows the defendant was predisposed to commit the offense and, consequently, the defense of entrapment was not available to him. (*People v. Tipton* (1980), 78 Ill. 2d 477.) In a recent case, the defendant was found to be predisposed to commit the offense where he seemed familiar with drugs and their quality, the drug trade in the area, where he offered the agent price breaks, and where the defendant's wife testified he had in the past used LSD and marijuana. (*People v. Cross* (1979), 77 Ill. 2d 396.) In *People v. Tipton*, the defendant was found to be predisposed

where he admitted he originated the idea of contacting the supplier and called the supplier several times, he had taken acid and had gotten his brother high, he had arranged two other sales subsequent to the offense charged, was familiar with drugs, and was willing to accommodate those desirous of obtaining drugs.

Our review of the record in the case at bar shows there was sufficient evidence from which the jury could have determined the defendant was predisposed to commit the offense. There was no evidence that McWethy was acting as an agent of the State at the time he met the defendant in early October. At that time the defendant gave him his home address, and McWethy visited him in mid-October for several hours. The substance of their conversation at that time was objected to by the State and the objection was correctly sustained by the court. McWethy's October 25 arrest, recognizance release on October 30, and introduction of Burns to the defendant on October 31 would certainly seem to indicate that McWethy had been impressed into service by the State as an informer. On the occasion of the first transaction, October 31, the informer allegedly supplied the defendant with a quarter-ounce of cocaine for which the informer wanted $475. However, the defendant—presumably an unwilling, entrapped victim—agreed after a total of approximately 30 minutes of coaxing that day to sell the cocaine at a profit to Burns for $550. The record does not indicate how this price was arrived at, save for a comment imputed to McWethy that the defendant could make "$75.00 that day real easy." The profit was purportedly to compensate the defendant for the use of his house.

The defendant's willingness to profit from such an illegal sale must certainly be considered a factor in determining whether he was predisposed to commit the illegal act. We also consider as evidence of predisposition his one-to-three times a month use of marijuana, and the fact that he expressed no reluctance whatsoever in participating in the cocaine testing ritual. Further, on the occasion of the second transaction on November 15, the defendant—at the merest suggestion from McWethy—extracted from the quarter-ounce of cocaine a small amount for his own use, replacing the lost weight with baking soda. He then felt "sheepish" about it when Burns complained about the quality of the cocaine and not only discounted the price to $530—thereby reducing his profit to $55—but also threw in the small portion he had extracted. Despite his alleged "sheepishness" about the aforegoing incident, on December 3 he precisely followed McWethy's instructions and mixed one full ounce of baking soda with the one ounce of cocaine he had allegedly received from McWethy and sold it to Burns as two ounces of cocaine for $3400, despite the fact McWethy demanded only $1800. In each of these

transactions, McWethy demanded less than the amount for which the defendant actually sold the cocaine, and the defendant testified Burns never threatened him.

The defendant's theory at trial that McWethy and Burns entrapped him into selling drugs by glorifying the financial advantages incidental thereto does not establish that entrapment of the unwary innocent occurred. It tends to demonstrate, however, that the selected "medium" was suitable for cultivation; that is, the defendant was predisposed to cooperate, and needed only the opportunity to do so. We conclude the defendant was self-motivated to profit by selling the cocaine, and McWethy and Burns merely provided him with an opportunity to achieve that profit, even assuming, arguendo, that McWethy supplied the cocaine. In appellate review of the entrapment defense, the court is to determine all testimony of the defendant in the light most favorable to him. (*People v. Carpentier* (1974), 20 Ill. App. 3d 1024.) Even affording the defendant's testimony this favorable consideration, we find the jury was correct in its finding that the defendant had not been entrapped but, rather, he was predisposed to commit the offense. As such, we do not feel the defendant may complain that his entrapment defense was prejudiced by the court's error with regard to the hearsay conversations, since the defense of entrapment is not available to a defendant who is predisposed to commit the offense.

■■ The State next argues the defendant has waived consideration of prejudicial reversible error arising as the result of the prosecutor's closing argument because the defendant failed to object during trial. (*People v. King* (1977), 66 Ill. 2d 551, 559.) The State points out that error in closing argument amounts to plain error only when a statement is so prejudicial that it deprives the defendant of a fair trial and has been a material factor in the guilty verdict of the jury. (*People v. Ford* (1980), 83 Ill. App. 3d 57, 69.) Of course, as defendant notes, it is true that counsel may not do or say anything in closing argument which is for the sole purpose of inflaming or prejudicing the jury against the defendant. (*People v. Dukes* (1957), 12 Ill. 2d 334.) However, defendant's charge that the prosecutor improperly referred to the defendant as a "big-time drug dealer" during closing argument is simply not supported by the record. The prosecutor's references to a "big-time drug dealer" were all references to McWethy, not the defendant. Defense counsel, on the other hand, did use the term in question in reference to the defendant when he argued to the jury that the State was trying to make the defendant look like a "big-time drug dealer." Consequently, defendant's charge of error in this respect is completely specious.

■■ The reference by the prosecutor to the entrapment defense as a "last

resort defense" during closing argument is next pointed out by the defendant, but defendant does not argue what prejudicial effect, if any, this statement may have had on the jury. Defendant simply cites authority for the proposition that the entrapment defense is a completely lawful one. (*People v. Cross* (1978), 63 Ill. App. 3d 628.) The prosecutor's description of the defense as a "last resort" one, does not negative its validity; considering that a defendant relying on the entrapment offense must first admit having committed the offense, the defense does appear to be the defendant's final hope. The State's analogy of the instant phrase to the insanity defense as a "last ditch" defense in *People v. Smith* (1976), 41 Ill. App. 3d 776, is well taken. The court in *Smith* found that phrase did not amount to plain error. We believe a similar result is warranted here, and defendant's failure to object at trial constitutes a waiver.

Defendant likewise has waived consideration of two other statements made by the prosecutor during closing argument. The defendant charges it was error for the prosecutor to argue that no one except the defendant had seen McWethy since October 31 since the State stipulated that the circuit court clerk's file on McWethy was true and correct. The defendant mischaracterizes the file as showing McWethy having made four court "appearances" in connection with his arrest for unlawful possession of cannabis and theft. The circuit clerk testified, however, there were four "continuances" of McWethy's case not "appearances" of McWethy. There is nothing in the record to suggest that McWethy was actually present when the continuances were granted.

The last of the prosecutor's comments complained of is that the defendant "had sold all kinds of drugs." Detective Donahoe testified the defendant had told him "* * * He had used every drug. He had used and sold them all and he knew about them." The prosecutor's statement was not only a proper inference from the evidence, it was very nearly a verbatim quote of what the jury had already heard during rebuttal testimony. The record simply does not support the defendant's contentions of error with regard to the prosecutor's closing argument. Further, his failure to interpose timely objections thereto have waived the issue on appeal.

■■ The defendant's last contention on appeal is that Detective Donahoe's testimony was improper because it did not rebut the character evidence submitted by the defendant. Defendant appears to ignore, however, that once he has presented some evidence of the affirmative defense of entrapment, the burden shifts to the State to rebut that evidence, and the State bears the burden of proving the defendant guilty beyond a reasonable doubt as to that issue together with all the other elements of the offense. *People v. Tipton* (1980), 78 Ill. 2d 477; Ill. Rev. Stat. 1979, ch. 38, par. 3—2(b).

As noted by the State, rebuttal evidence is that which is produced to explain, repel, contradict, or disprove evidence given by the defendant. (*People v. Nettles* (1969), 107 Ill. App. 2d 143.) Detective Donahoe's testimony was classically rebuttal in nature. The defendant at one point testified he never used any drugs whatsoever, but testified later he did smoke marijuana occasionally. He also testified he never used cocaine except during during the incidents with Burns. The pre-plea report was offered to rebut that particular part of his testimony since the report preparer testified the defendant himself stated he used cocaine once or twice a week up until January of 1979. On cross-examination, the defendant testified he had not used cocaine before October 31, 1978, nor in the year 1979. The evidence showed defendant was only in Burns' presence on three occasions, however; October 31, November 15 and December 3. Detective Donahoe's testimony likewise rebutted the defendant's testimony since the defendant stated to him in June or July of 1977 that he had "used and sold all drugs" which includes both cocaine and marijuana. The purpose of the rebuttal testimony offered by the State through Detective Donahoe's testimony was not meant to rebut the evidence given by the defendant's character witnesses; it was meant to rebut the defendant's entrapment defense by showing his predisposition to commit the offense charged. Furthermore, the record shows the defendant was fully aware that the purpose of Donahoe's testimony was to impeach the defendant's credibility because the court heard arguments in chambers during trial about its intended use and it was determined at that time that it was proper rebuttal testimony.

For the foregoing reasons, we affirm the judgment of the circuit court of Kane County.

Judgment affirmed.

HOPF and VAN DEUSEN, JJ., concur.