THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM CONNOR *et al.*, Defendants-Appellants.

First District (5th Division)   Nos. 86—1321, 86—1387, 86—1454 cons.

Opinion filed November 28, 1988.

Mary Robinson, of Robinson & Skelnik, of Elgin, and Jed Stone, of Jed Stone, Ltd., of Waukegan, for appellant William Connor.

Thomas Peters, of Chicago, for appellant Roderick Bulls.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr.,

John A. Gasiorowski, and Francine Taylor-Thirus, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MURRAY delivered the opinion of the court:

This is a consolidated appeal by defendants, William Connor and Roderick Bulls, from a bench trial in which they were found guilty of delivery of more than 30 grams of a controlled substance. They each were subsequently sentenced to six years of imprisonment. The trial court directed verdicts for defendants on the charges of calculated criminal drug conspiracy. Two other defendants, Randy Tapley and Leotes Tillie, were acquitted on the same two counts.

The record discloses the following facts: In October 1983, Bulls was 30 years old and married with five children. His cousin, Connor, was the same age and unmarried, although by trial time he had married a woman with three children. Both defendants attended college: Connor received a degree from Tuskegee Institute and Bulls was nine hours short of receiving a degree in business administration from the University of Southern Colorado. Neither man had any previous criminal record nor any known involvement as users or sellers of drugs.

In the fall of 1983, Bulls began his own business as a shipping broker, having previously worked as a broker for Universal Air Freight. Connor worked as a full-time assistant coach and security aid for the Waukegan School District. He also worked part time as a salesman for a men's clothing store and as an account executive for Bulls' business. As a shipping broker, Bulls would find truckers to transport goods for various suppliers. This necessitated that Bulls issue "comp" checks to the drivers immediately after or during their trips to cover their expenses. Bulls testified that a shipper was responsible to Bulls for that amount immediately after delivery of the goods, with the remainder owed to him due between 7 and 30 days thereafter.

On at least four occasions prior to December 29, Bulls had shipped goods for shippers, such as Pepperidge Farm, obtained by a man he knew as Bobby Johnson (B.J.). B.J. claimed to be a representative for Donna Produce, which allegedly was owned by B.J.'s wife. Bulls obtained transportation for these shipments through Seacoast Shippers. He would front the comp money to the drivers, after which he did not receive reimbursement from B.J. Seacoast then billed Bulls for the shipments. Documents submitted by Bulls showed that Donna Produce owed him over $13,000, which was never paid despite Bulls' repeated requests to B.J. for payment. According to Bulls, he was therefore unable to pay Seacoast and could not book any new busi-

ness. Additionally, accounts he had obtained on his own with companies such as McDonald's and Dean Foods were jeopardized because consistency and reliability were critical factors in this kind of business.

On December 29, 1983, B.J. called Bulls and said he had a $2,700 comp check for him and asked Bulls to meet him at a Red Coach Inn restaurant (Red Coach) in Schiller Park. When Bulls arrived, B.J. introduced him to another man, Mike Kennedy, who claimed to work for Donna Produce and supposedly had five trucks and drivers. In reality, Kennedy was Gary Brotan, a Cook County sheriff's police officer assigned to Northeastern Metropolitan Enforcement Group (MEG) as an undercover agent. When Bulls asked for the comp check, B.J. said he had not yet received it but that it was in the mail to him (B.J.). After discussing trucking business, Brotan and B.J. told Bulls that they supplied cocaine to truckers, but that Brotan's source was under arrest. They asked Bulls if he could obtain some cocaine. Later, after B.J. and Bulls returned from the washroom, a small packet of white powder, later determined to be cocaine, was passed to Brotan at the bar. Bulls testified that in the washroom, B.J. had showed the packet to him and said that Bulls was supposed to have brought it for Brotan. Bulls denied giving it to Brotan; Brotan was not sure from whom he had received the packet, Bulls or B.J.

After this meeting, Bulls testified that he kept asking B.J. for the money owed him and was told that "Kennedy" needed a new source. Bulls claimed that he knew of no source. Bulls said that eventually B.J. told him that if he (Bulls) could find a source, B.J. would then be able to pay him. On December 30, Brotan called Bulls and again asked if Bulls could obtain cocaine. Bulls handed the phone to Leo. At trial, Brotan made a voice identification of Leo as Leotes Tillie, which identification was objected to by defendants. When asked to sell Brotan a half ounce of cocaine, Leo responded by saying that he (Leo) had to contact someone else. Brotan called later and Leo said his source was out of town. On January 1, 1984, Brotan again called Bulls and Bulls said he would have to contact Leo.

Meanwhile, Bulls had asked his cousin Connor to help. After several more phone calls from Brotan, Bulls called him back on January 2, telling him to meet Leo at the Red Coach. No one but Brotan went to the meeting place. Brotan then called Bulls, and Leo arranged to meet him that night (January 3) along with Bulls and Connor. By that time, Connor had found a source, Ambrosia Chapa. Connor testified that Chapa was in the clothing store and overheard Connor talking to Bulls on the telephone. Chapa, who had previously worked in the

store, offered to help Connor.

Bulls, Connor, and Brotan met on January 3. Brotan asked Connor if he could handle two kilos of cocaine and Connor replied that he would have to talk to his source. After making several telephone calls, Connor told Brotan that he could supply it, but details had to be worked out later because the source was too high to deal at that time. Bulls then told Brotan that he had a half ounce to sell for $1,000, but Brotan replied that he did not need it if he could get two kilos. Brotan took a sample from the ounce supply. The next day, there were several more calls between Brotan, Connor, and Bulls to work out details. Connor set up a meeting for the next evening (January 5) in Bulls' business office in Waukegan. Brotan vetoed that location and suggested the Bob Evans restaurant in Des Plaines.

On January 5, Brotan called Bulls, who told him that Connor would be calling. Connor called Brotan later and said that his source was still looking for some cocaine. The meeting was later cancelled because Connor could not reach the source. There were many more calls on January 6. Brotan was told that the source didn't like the quality of the drug and was still searching. On January 7, B.J. told Bulls that he would have a $2,700 comp check for him which B.J. would bring to the meeting at Bob Evans later that day. Later, Connor, Bulls, and Leo went to the restaurant as did Chapa, Brotan, and Randy Tapley. After approximately two kilos of cocaine were passed to Brotan in the parking lot, agents moved in and arrested the men. Chapa died before trial.

There were some disputes at trial regarding these conversations. Moreover, the above facts are a summarization and do not include all testimony relevant to the defense of entrapment, which additional facts are not necessary in view of our determination of this cause. The record also reveals that, according to Bulls, he was in daily contact with B.J., attempting to get his money and that B.J. kept promising to pay if Bulls could find a cocaine source. B.J. was paid $3,000 by MEG for this job and had worked as an informant for them before these events. Brotan stated that he did not know that B.J. owed money to Bulls. Bulls claimed that he had never seen Chapa or Tapley before the parking lot transaction. There was no recordation of Donna Produce with either the county or State and neither Bobby Johnson nor his wife could be found. Bulls Transportation Company went out of business.

Prior to trial, defendants attempted to require the State to disclose the identity and whereabouts of the informer, B.J. At a pretrial hearing, the court denied the disclosure request after the State

claimed that he was not a participant in the transaction and, therefore, his presence was unnecessary.

After proofs were closed, the trial court denied defendants' motion to strike portions of the cross-examination of them regarding statements they allegedly made to Brotan, although statements they denied making to B.J. were stricken. In finding both defendants guilty, the court concluded that an honest person would have walked out when cocaine was first discussed and, further, that a $13,000 debt was an insignificant sum for a business so as to have pushed Bulls and Connor into participating in illegal conduct. It also noted that Chapa was probably the actual source, but found that he was Connor's friend. The court also suggested that both defendants talked and acted like professionals and found it difficult to believe some of their testimony.

On appeal, defendants contend that they presented a defense of entrapment which was not rebutted by the State, it was error not to permit the production of an informant whose actions gave rise to defendants' entrapment defense, and that they were denied a fair trial by the State's improper cross-examination.

We reverse and remand this cause because defendants did not receive a fair trial.

In Illinois, entrapment occurs when the criminal design originates with the State and it implants the disposition to commit an offense in an innocent person's mind and that person is incited or induced by a public officer or his agent for the purpose of obtaining evidence for prosecution of such person. (Ill. Rev. Stat. 1985, ch. 38, par. 7—12.) The crucial element is whether the State's deception actually implanted the criminal design in the defendant's mind; merely affording an opportunity for the criminal act does not constitute entrapment. (*People v. Cross* (1979), 77 Ill. 2d 396, 396 N.E.2d 812.) In other words, lack of a defendant's disposition to commit the crime is the principle element of an entrapment defense. (*People v. Boalbey* (1986), 143 Ill. App. 3d 362, 493 N.E.2d 369.) Once an entrapment defense is raised, the burden of proof shifts to the State to prove beyond a reasonable doubt that there was no entrapment. (*People v. Husted* (1981), 97 Ill. App. 3d 160, 422 N.E.2d 962.) Moreover, in appellate review of an entrapment defense, a court is to determine all testimony of a defendant in a light most favorable to him. *Husted,* 97 Ill. App. 3d at 171, 422 N.E.2d at 970.

There is no doubt that in the present case, defendants have effectively raised the defense of entrapment. According to their testimony, it does appear possible that the informant B.J. placed Bulls and his

fledgling business in an untenable financial situation. B.J. allegedly placed defendants in a financial bind after which he persistently urged them to obtain cocaine so that he (B.J.) could pay his debt to them. However, the undercover agent denied any knowledge of B.J.'s activities. There are also discrepancies as to what transpired in conversations between the participants.

■■ ■ Since predisposition is necessarily determined by a defendant's willingness to participate in criminal activity *before* his initial exposure to government agents (see *United States v. Kaminski* (7th Cir. 1983), 703 F.2d 1004), B.J.'s activities are crucial in the present case. It is fundamental that the qualified privilege to conceal an informant's identity must give way where disclosure of that identity would be relevant and helpful to the accused's defense or essential *to a fair trial.* (*Roviaro v. United States* (1957), 353 U.S. 53, 1 L. Ed. 2d 639, 77 S. Ct. 623.) Moreover, an informant's identity can be required where he acted in the dual role of informant-participant in the crime. See *People v. Brown* (1986), 151 Ill. App. 3d 446, 502 N.E.2d 850 (and cites therein).

■■ ■ However, disclosure is not required where it is a prosecution secret and the nondisclosure will not infringe upon the accused's constitutional rights. (107 Ill. 2d .R. 412(j)(ii).) Whether a constitutional deprivation has occurred depends on whether the informant's identity is necessary to show a defendant's innocence, *i.e.,* identity of the informant must be crucial to proof of a defense asserted by a defendant. (*People v. Sanchez* (1987), 163 Ill. App. 3d 186, 516 N.E.2d 556.) The present record discloses no compelling reason for the State to conceal B.J.'s identity, especially when B.J. is the only witness to the alleged inducement an/or "setting the trap" by creating financial difficulties for defendants, and then offering a solution, albeit an illegal one. Accordingly, it was error for the State to refuse to disclose B.J.'s identity, thereby denying defendants a fair trial.

■■ Although this cause must be reversed and remanded on the above ground, we must mention a second potentially reversible error so that it is not repeated. Improper cross-examination of both defendants occurred when the State attempted to impeach them by asking questions having no basis in the facts. When defendants denied the insinuations inherent in the questions, the State put forth no proof that such statements or acts had occurred. It was exactly this type of improper tactics that our supreme court strongly denounced in *People v. Butler* (1974), 58 Ill. 2d 45, 317 N.E.2d 35. "Such tactics have no place in the search for truth which is the objective of cross-examination and of the trial itself. (*Butler,* 58 Ill. 2d at 52, 317 N.E.2d at 39.)

We urge all attorneys to keep this maxim in mind during the rigors of trial participation.

For the above reasons, we reverse and remand this cause for a new trial.

Reversed and remanded.

LORENZ, P.J., and PINCHAM, J., concur.