THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PETER POULOS, Defendant-Appellant.

First District (6th Division)  No. 1—89—2738

Opinion filed March 30, 1990.

Louis B. Garippo, Ltd., of Chicago (Louis B. Garippo and Thomas A. Moore, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, Assistant State's Attorney, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

Following a trial without a jury, defendant, Peter Poulos, was convicted of delivery of a controlled substance, and subsequently was sentenced to a six-year prison term. Defendant appeals, alleging that the trial court erred in finding him guilty since he was entrapped by a State agent.

The following facts were elicited at trial. Defendant testified in his own behalf. He stated that at the time of his arrest, he was employed as a sales representative for the Dimock-Gould Company. On March 6, 1988, he saw an advertisement for the sale of a video game room. The advertisement stated, "Game room and candy store for sale. Great money maker. Asking $26,000. 916-8150."

That evening, defendant called the telephone number listed in the advertisement. Michael Budaj answered the call, identifying himself as Mike Peligreno. Budaj was an informant for the State. Budaj told defendant that he was associated with a company called Glennit Vending. He further told defendant that the game room was doing approximately $250 of business each day.

On March 9, 1988, defendant and Budaj met for 2½ hours at the game room, which was located at 5659 West North Avenue. The game room contained 11 video machines for playing, and various items such as candy, perfume and jewelry for sale. The game room was frequented by children from a nearby school. After observing the business operation, defendant negotiated with Budaj regarding the selling price. The sale was completed on March 29, 1988, for a final price of $18,000. Defendant executed a lease agreement with Better Deal Realty for the lease of the premises, and additionally leased an alarm system from Gilbert Security Company. At Budaj's urging, defendant hired Antonio Jarmello to work at the game room.

Defendant testified that following the purchase, Budaj continued to frequent the game room, and for a few days after the sale, Budaj assisted in the operation of the business. Budaj then told defendant he was going to New York and that he would return in mid-April.

Upon Budaj's return, he met with defendant at the game room. Defendant stated that they discussed Budaj's failure to obtain city stickers for the video machines as promised, and that defendant asked him when he would get these stickers. Defendant additionally testified that he asked Budaj to purchase new video machines from the company with which Budaj was associated. Defendant testified that it was

during this mid-April meeting that Budaj asked defendant if he could find a cocaine supplier. Defendant told Budaj that he could not and that he had never been involved with cocaine and did not want to get involved.

A few days later, Budaj brought Gregory Brotan, a special agent with the Northeastern Metropolitan Enforcement Group, to the game room. Budaj introduced Brotan to defendant as "Greg." This was defendant's first contact with Brotan.

Defendant continued to work as a sales representative for Dimock-Gould throughout the period of mid-April 1988 to May 1988. He usually arrived at the game room at approximately 6:30 p.m. and stayed until closing, at 9 p.m. During this time, Budaj was at the game room at least five days a week. Budaj had no ownership interest in, nor was he employed at, the game room.

Defendant stated that he and Budaj went out to local restaurants at least twice a week after the game room closed. During these meetings, defendant constantly asked Budaj to purchase new video machines for the game room. Budaj always steered the conversation to drugs. Specifically, Budaj wanted defendant to find a cocaine supplier for Brotan. Defendant stated that Budaj asked him to do so on at least 15 to 20 occasions, and that on each occasion, defendant refused.

Defendant stated that on June 9, 1988, as he was closing the game room, Budaj came in, telephoned an individual named Jessie, and then left. Approximately 30 minutes later Budaj returned, and shortly afterward, Jessie arrived. Defendant, Budaj and Jessie went into a back room, where Budaj handed Jessie money in exchange for a package containing cocaine. Jessie then left the game room. After Jessie left, Budaj asked defendant to sell the cocaine to Brotan. Defendant stated that he repeatedly refused, but that he eventually agreed to sell the cocaine to Brotan as a favor to Budaj. At Budaj's request, defendant telephoned Brotan.

Brotan stated that at approximately 10:30 p.m., he telephoned defendant at the game room in response to a message left on his pager. The two agreed that Brotan would come to get the cocaine the following day. Brotan stated that prior to that date, he had spoken to defendant both on the telephone and twice in person. Brotan further stated that defendant had negotiated the sale of the cocaine on one of the earlier dates. Brotan did not contradict defendant's testimony that Budaj introduced him to defendant.

Defendant testified that Brotan came to the game room at approximately 11 a.m. on June 10, 1988. Defendant gave him the cocaine and, in return, Brotan gave him $1,100. Brotan stated that

defendant told him he was "really going to like it because it was good looking stuff." Brotan further stated that he and defendant began negotiating another drug deal for one kilogram of cocaine and that defendant told Brotan that he was getting familiar with his connection. Brotan said that defendant said that he would contact Brotan at a later date. Further, defendant told Brotan that he would "have to do a couple of ounces" with him once this next deal was completed. Brotan then left.

Defendant testified that Budaj arrived one hour after the completion of this transaction. Defendant gave him the $1,100. Budaj put $100 in defendant's shirt pocket. Defendant stated that he immediately told Budaj that he did not want the money. Later, he accepted the $100. He stated, however, that there was no prior agreement with Budaj that defendant would be paid for his actions.

Defendant stated that prior to the June 10, 1988, transaction, he had spoken on the telephone with Brotan five or six times. Each time he contacted Brotan, the call was placed from the game room, and Budaj was present. Brotan testified that on at least one of these occasions, May 8, 1988, he and defendant discussed a transaction for one kilogram of cocaine. Brotan stated that defendant informed him that Antonio (Jarmello) was putting together a kilogram for $20,000, and that Brotan was to give defendant $5,000 prior to receiving the cocaine. Defendant agreed that this conversation occurred, but not on May 8, 1988. Defendant stated that he had this conversation only because Budaj asked him to do so. Budaj was not called to testify.

At trial defendant raised the affirmative defense of entrapment. The trial court, however, found that defendant had not established the defense and, accordingly, found defendant guilty of delivery of a controlled substance. In his motion for a new trial, defendant argued that the defense of entrapment was unrebutted. The State countered that defendant's conduct showed beyond a reasonable doubt that defendant was predisposed to commit the offense of delivery of a controlled substance. The trial court denied defendant's motion.

■ Citing *People v. Connor* (1988), 176 Ill. App. 3d 900, 531 N.E.2d 966, and *People v. Husted* (1981), 97 Ill. App. 3d 160, 422 N.E.2d 962, defendant initially notes that in appellate review of the entrapment defense, the court is to determine all testimony of the defendant in the light most favorable to him. This rule, however, originated in *People v. Carpentier* (1974), 20 Ill. App. 3d 1024, 314 N.E.2d 647, and in that case, this court stated that when determining whether a defendant is entitled to *a jury instruction* on the defense of entrapment, the court is to examine the defendant's testimony in

the light most favorable to him. Thus, in our view, *Connor* and *Husted* misstate our standard in review of the entrapment defense. The proper standard was articulated by the supreme court in *People v. Tipton* (1980), 78 Ill. 2d 477, 401 N.E.2d 528. Specifically, the question of whether entrapment exists is one for the finder of fact and will not be disturbed on appeal unless the reviewing court concludes that entrapment exists as a matter of law. *People v. Tipton* (1980), 78 Ill. 2d 477, 401 N.E.2d 528.

With this general principle in mind, we will examine defendant's contentions on appeal. Defendant maintains that he was entrapped into making the sale of cocaine by Budaj, the State informant, who originated the plan. Defendant further maintains that he lacked the predisposition to make the sale.

■ The Illinois entrapment statutes provides as follows:

"A person is not guilty of an offense if his conduct is incited or induced by a public officer or employee, or agent of either, for the purpose of obtaining evidence for the prosecution of such person. However, this Section is inapplicable if a public officer or employee, or agent of either, merely affords to such person the opportunity or facility for committing an offense in furtherance of a criminal purpose which such person has originated." (Ill. Rev. Stat. 1987, ch. 38, par. 7—12.)

Thus, the critical inquiry in an entrapment case is whether the criminal purpose originated with the defendant. (Ill. Rev. Stat. 1987, ch. 38, par. 7—12; *People v. Cross* (1979), 77 Ill. 2d 396, 396 N.E.2d 812.) If some evidence on the issue of entrapment is raised, the State must prove beyond a reasonable doubt that the defendant was not entrapped, together with all other elements of the offense. (*People v. Andreano* (1978), 64 Ill. App. 3d 551, 381 N.E.2d 783.) More specifically, the defendant must demonstrate that the State induced him to commit a criminal act, and if the defendant does so, then the burden is on the State to prove the defendant was ready and willing to commit the crime without persuasion. (Ill. Rev. Stat. 1987, ch. 38, par. 7—12; *People v. Boalbey* (1986), 143 Ill. App. 3d 362, 493 N.E.2d 369.) Merely affording an opportunity for the criminal act, however, does not constitute entrapment. *People v. Connor* (1988), 176 Ill. App. 3d 900, 531 N.E.2d 966.

■ A review of the evidence presented here leads to the conclusion that defendant was entrapped as a matter of law. The testimony reflects that the State more than merely afforded defendant an opportunity for the criminal act. Rather, the State through Budaj induced defendant to enter into the transaction resulting in the delivery of a

controlled substance. Brotan did not and apparently could not rebut Budaj's role in inducing defendant to commit the offense. Moreover, the evidence is insufficient to support a finding of predisposition on the part of defendant.

In March 1988, Budaj placed an advertisement in a newspaper for the sale of a game room. Defendant was looking for new financial opportunities and called Budaj so as to investigate this potential opportunity. Defendant purchased the game room from Budaj after negotiating the selling price down from $26,000 to $18,000. There is no indication that when Budaj placed the advertisement in the paper, he did so with the intent that defendant be the party to respond to the advertisement; rather, it appears that defendant's response was merely fortuitous.

Following the purchase of the game room, defendant entered into a series of transactions, all of which we view as tending to establish the legitimacy of the business enterprise. First, defendant entered into a lease for the use of the premises. Defendant additionally leased a security system. Defendant then obtained a membership in a wholesale candy distributor club. Defendant purchased candy from the wholesale business throughout the two-month period during which he operated the business. These transactions, supported by documentation which was entered into evidence, lead us to the conclusion that defendant was attempting to operate a lawful business.

Budaj continued to frequent the game room, and just two weeks after the sale, asked if defendant could find him a supplier of cocaine. Defendant replied that he had never been involved with drugs and did not want to become involved. Nonetheless, during the next two months, Budaj repeatedly asked defendant to find a cocaine supplier. These requests frequently came at restaurant meetings when defendant was attempting to get Budaj to rotate the video machines at the game room.

Budaj next arranged to have the cocaine delivered to the game room, and then requested that defendant contact Brotan and arrange to sell him the cocaine. (Budaj previously had asked defendant to contact Brotan to discuss the possible sale of one kilogram of cocaine.) Defendant first refused, but later relented.

■■ It is clear that the criminal conduct was conceived in the mind of the State agent, and not in defendant's mind. The type of governmental misconduct in which Budaj engaged consistently has been held to be entrapment. (See, *e.g.*, *People v. Boalbey*, (1986), 143 Ill. App. 3d 362, 493 N.E.2d 369; *People v. Martin* (1984), 124 Ill. App. 3d 590, 464 N.E.2d 837.) Defendant was running a legitimate

business when, for no apparent reason, he was approached by Budaj and induced to commit a crime. In our view, this was a State-generated crime.

The State argues, however, that the trial court properly found that defendant had not introduced credible evidence to support his contention that he was entrapped due to the inducement of the informer. In explaining its verdict, the trial court stated:

> "It is absolutely incredible to suggest that somehow the hope of getting a transfer of machines, when the defendant admits he is aware that there are other sources is going to be a sufficient basis for the defense of entrapment."

The State maintains that this statement should be interpreted as a finding that defendant's entire testimony was incredible. A review of the record, however, reveals that the trial court found incredible only the sufficiency of defendant's motivation for agreeing to deliver the cocaine to Brotan. In fact, at the hearing on defendant's motion for a new trial, the court stated:

> "The bottom line in this case is that the defendant was—no question about it—was persuaded to become involved in this because there was an informant. But as I indicated at the time, the defendant easily could have said, 'No.' "

This statement leads to the conclusion that the trial court found credible at least this critical portion of defendant's testimony. Thus, we do not find that the trial court found defendant's entire testimony to be incredible.

The State additionally argues that defendant improperly relies on hearsay statements to establish his contention that he was induced by Budaj into delivering the cocaine to Brotan. The statements of which the State complains were admitted into evidence, over the State's objections, for the purpose of showing defendant's state of mind. The State maintains that defendant is attempting to expand the use of these conversations to show that Budaj actually coaxed him into becoming a drug dealer. Here, however, where our inquiry necessarily must be into the effect which these statements had upon defendant, the state of mind exception to the hearsay rule operates to permit examination of these statements as substantive evidence of defendant's state of mind. Defendant does not make improper use of this evidence.

We find that defendant, as a matter of law, introduced evidence of inducement sufficient to shift the burden to the State to prove beyond a reasonable doubt that defendant was not entrapped. (See *People v. Chanath* (1989), 184 Ill. App. 3d 521, 540 N.E.2d 468.)

The State did not meet that burden. Defendant presented unrebutted testimony that the criminal purpose originated in the mind of a State agent and that this State agent induced him to commit the offense.

■ It is noteworthy that the State failed to call the informant to testify. While the State was not obligated to call the informant, its failure to do so gives rise to an inference against the State. (*People v. Cross* (1979), 77 Ill. 2d 396, 396 N.E.2d 812; *People v. Strong* (1961), 21 Ill. 2d 320, 172 N.E.2d 765.) This inference is particularly significant where, as here, the State fails to establish beyond a reasonable doubt that defendant was predisposed to commit the offense of delivery of a controlled substance. See *People v. Tipton* (1980), 78 Ill. 2d 477, 401 N.E.2d 528; *People v. Cross* (1979), 77 Ill. 2d 396, 396 N.E.2d 812.

■ Generally, predisposition is established by a defendant's willingness to participate in criminal activity before his initial exposure to government agents. (*People v. Connor* (1988), 176 Ill. App. 3d 900, 531 N.E.2d 966.) The determination of predisposition to commit crime rests upon the facts of the case. (*People v. Katsigiannis* (1988), 171 Ill. App. 3d 1090, 526 N.E.2d 508.) Factors to be considered in assessing predisposition include the defendant's initial reluctance or his ready willingness to commit the crime, the defendant's familiarity with drugs and his willingness to accommodate the needs of drug users, the defendant's willingness to make a profit from the illegal act, the defendant's prior or current use of illegal drugs, and the defendant's participation in testing or cutting the drugs. (*People v. Schillaci* (1988), 171 Ill. App. 3d 510, 526 N.E.2d 871; *People v. Norks* (1985), 137 Ill. App. 3d 1078, 484 N.E.2d 1261.) Moreover, the trial court should consider whether the defendant engaged in a course of conduct involving similar offenses and whether the defendant had ready access to a drug supply. (*People v. Beavers* (1986), 141 Ill. App. 3d 790, 491 N.E.2d 438.) Finally, the trial court may consider evidence of a defendant's subsequent activities. *People v. Tipton* (1980), 78 Ill. 2d 477, 401 N.E.2d 528.

A review of the record with these considerations in mind reveals no evidence that defendant was willing to commit the offense in furtherance of a criminal purpose which he originated. Rather, defendant committed the offense only after exposure to the State's agent.

The unrebutted testimony of defendant reveals his initial refusal to commit the offense as well as his lack of knowledge of the narcotics business. The State introduced no evidence of prior narcotics-related offenses, nor did it introduce evidence of subsequent narcotics-related activities. Defendant specifically stated that he did not know

of a cocaine supplier because he had never been involved in narcotics and did not want to become involved. (See *People v. Beavers* (1986), 141 Ill. App. 3d 790, 491 N.E.2d 438 (trial court properly found defense of entrapment had not been established when evidence established that defendant sold cocaine three times within two weeks and that she frequently used cocaine, was able to acquire promptly the requested quantities, was familiar with drug terminology and prices, and housed the equipment associated with cocaine use in her home).) Defendant did not participate in testing or cutting the cocaine. Moreover, although defendant did eventually accept $100 from Budaj, he did not enter into an agreement to profit financially from the transaction. See *People v. Norks* (1985), 137 Ill. App. 3d 1078, 484 N.E.2d 1261 (trial court properly found defendant had not established the defense of entrapment when defendant admitted he engaged in a drug transaction to make money).

The State argues that defendant's expression of a desire to do drug business in the future with Brotan was indicative of a predisposition to deliver a controlled substance. The State notes that defendant negotiated with Brotan and that he told Brotan he was getting familiar with his connection. Further, the State observes that defendant told Brotan that they would have to "do a couple of ounces" together. The State concludes that the trial court properly determined that these conversations manifested a familiarity with drugs and a willingness to accommodate the needs of drug users.

■ In our view, however, these conversations fall short of establishing a predisposition, and at most, establish that once induced to commit the offense, defendant in fact committed the offense. The unrebutted testimony of defendant reveals that he committed the offense at the urging of Budaj, that Budaj, not defendant, supplied the cocaine, that all of his conversations with Brotan were directed by Budaj, and most significantly, that prior to meeting Budaj, defendant was not involved in drugs in any way.

■ Finally, the State argues that defendant's failure to withdraw from the scheme shows his predisposition to commit the offense. The State points out that defendant was a sophisticated businessman, who had effectively negotiated the sales price of the game room, and who chose not to withdraw from the criminal scheme. While all this is true, the failure to "just say no" is immaterial in an entrapment defense. The plain language of the statute sets forth only two requirements, improper inducement on the part of the government, and a lack of predisposition to commit the crime on the part of the defendant. (*People v. Andreano* (1978), 64 Ill. App. 3d 551, 381 N.E.2d 783.)

There is no requirement that the defendant demonstrate an attempt to withdraw once induced into committing the offense.

In our view, the State failed to establish beyond a reasonable doubt that defendant was predisposed to commit the offense. Thus, in light of our earlier finding of improper inducement on the part of the government, we find that defendant, as a matter of law, established the affirmative defense of entrapment. Accordingly, we hold that defendant was improperly convicted of delivery of a controlled substance.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed.

Judgment reversed.

EGAN and RAKOWSKI, JJ., concur.