THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. NORMAN DOBRINO, Defendant-Appellant.

First District (1st Division)   Nos. 1—88—0733, 1—90—3224 cons.

Opinion filed March 30, 1992.

Michael J. Pelletier and Karen Daniel, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Veronica Calderon, and Catherine A. Hufford, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial, defendant, Norman Dobrino was convicted on three counts of delivery of a controlled substance (Ill. Rev. Stat. 1987, ch. 56½, par. 1401(a)(2)), sentenced to 10 concurrent years' imprisonment on each count, and fined $25,000 on each count. Defendant appealed, and while his appeal was pending, he filed a petition pursuant to the Post-Conviction Hearing Act (Ill. Rev. Stat. 1985, ch. 38, par. 122—1 *et seq.*). The trial court summarily dismissed defendant's petition, without a hearing. Defendant also appeals that order. These two appeals have been consolidated for disposition. On appeal, defendant contends that: (1) the trial court erred in prohibiting defendant from presenting evidence of his lack of prior narcotics convictions and evidence of alleged police intimidation, to support his defense of entrapment; (2) the trial court erred in sentencing defendant to an extended term of 10 years for delivery of more than 30 grams of a controlled substance containing cocaine; and (3) the trial court erred in summarily dismissing defendant's *pro se* post-conviction petition. For the following reasons, the judgment of the trial court is affirmed.

The record sets forth the following facts relevant to this appeal. Prior to trial,[1] defendant moved to discharge the indictments on the grounds of prosecutorial misconduct. Defendant alleged that on the evening before trial, police officers had gone to defendant's home and kicked one of defendant's dogs so severely that it had to be put to sleep. Defendant alleged that these men threatened that if certain

---

[1] A mistrial was declared following defendant's first trial for delivery of a controlled substance because the jury failed to reach a unanimous verdict.

witnesses testified at trial, they would return and kill the other dog. According to defendant, the men wore ski masks and had covered the license plates on their unmarked car. The trial court denied defendant's motion and barred defense counsel from introducing any evidence of the incident to the jury, because defendant had no proof that the incident actually took place. The trial court then granted the State's motion *in limine* to prevent any evidence of defendant's lack of prior convictions or arrests.

On September 3, 1986, defendant was arrested for selling 12 ounces of cocaine to an undercover Chicago police officer. At trial, Chicago police officer Philip Pariso testified on behalf of the State that, on August 12, 1986, he first met with Gina Ranallo at the Drug Enforcement Administration (DEA) offices. Ranallo told Pariso that she had been dealing cocaine for defendant and his wife, Sabine Dobrino. Ranallo told Pariso that the defendant lived at 1421 West Wolfram, Chicago. Ranallo told Pariso that she had problems with the Dobrinos because she owed them money. Pariso told Ranallo he would try to help her.

On August 13, at approximately 8 p.m., Pariso and Ranallo went to defendant's home accompanied by a number of surveillance officers. When defendant answered the door, Ranallo introduced Pariso as her boyfriend, "Joey." Defendant and Sabine began to argue with Ranallo about the amount of money Ranallo allegedly owed them. After approximately a half an hour, Pariso took $200 out of his pocket and handed it to defendant to repay Ranallo's debt because Ranallo had told him that she owed defendant $200. Defendant told Pariso that Ranallo's debt was actually closer to $5,000 or $6,000. Pariso and Ranallo left defendant's home shortly thereafter.

On August 15, Pariso called defendant on the telephone and told him he wanted to come over to discuss Ranallo's debt. Accompanied by a surveillance officer, Pariso arrived at defendant's home at approximately 1 p.m. Pariso talked to defendant in the front room. Defendant showed Pariso a blue ledger book of names and numbers in an attempt to prove that Ranallo owed him $4,875. Defendant explained that girls dealt small amounts of cocaine for him and Sabine, and that the ledger book showed the amounts of money owed to them by the girls. Defendant stated that Sabine handled the girls, while he handled the larger customers. At that time, Pariso told defendant that he was interested in buying some cocaine, and defendant showed Pariso his price list for ounces of cocaine.

Pariso told defendant that he was not sure he wanted to pay such a large debt for Ranallo, but that if they did some business together

with the cocaine, he may be able to pay the debt off a little bit at a time. Pariso left defendant's house approximately 45 minutes later.

On August 18, at approximately 11 a.m., Pariso called defendant's house and spoke to Sabine. Pariso told Sabine that he wanted to buy a couple ounces of cocaine, and Sabine told Pariso that the cost would be $1,500 an ounce, but that he should call back later because defendant was sleeping. Pariso called back at 2 p.m. and defendant told Pariso to come over. Pariso arrived at defendant's house at 2:45 and he again discussed Ranallo's debt with defendant. Defendant then went into a bedroom and returned to the front room a few minutes later. Defendant handed Pariso two packs of Parliament cigarettes, each containing a clear plastic bag containing one ounce of cocaine. Pariso gave defendant $3,000.

Defendant told Pariso that his "source" lived around O'Hare airport and that he gets two or three kilos of cocaine a week. Defendant said that he had a half a pound of cocaine on hand at that time, and that he was expecting a new batch to come in. After a half an hour, Pariso left. He did not arrest defendant at that time because he was hoping to learn the identity of his source. Analysis of the cocaine revealed that it was 88% pure and Pariso estimated the street value at approximately $35,000.

Pariso called defendant again on August 25 and told him he wanted to buy two more ounces of cocaine. On August 26, Pariso went back to defendant's house and purchased two ounces of cocaine for $3,000. Pariso told defendant he wanted to buy two kilos, and defendant said it would cost $80,000, but that he would have to talk to his supplier first.

On September 2, Pariso went to defendant's house in the late afternoon and defendant told him that his supplier would not front him such a large quantity of cocaine, but would sell him a smaller amount. Pariso agreed to buy 12 ounces the next day for $1,400 an ounce, a total of $16,000.

On September 3, Pariso called defendant and defendant said he could only get 10 ounces of cocaine. Approximately 6:15 p.m. Pariso returned to defendant's house. Defendant had previously told Pariso that he only felt safe making transactions in his home. At that time Pariso carried an electronic agent-alert device and was accompanied by a number of surveillance officers who intended to arrest defendant and execute a search warrant. Defendant escorted Pariso into a bedroom in the rear of the house and gave Pariso a package to weigh on a scale. As Pariso weighed the package, he hit the agent-alert signal.

They heard pounding on the front door and defendant told Pariso to hide in a closet.

Defendant and Sabine were arrested. One officer asked defendant if he had any other drugs in the house and defendant said there were drugs in the bedroom. Defendant would not disclose any information about his supplier because he feared being killed. Police searched defendant and recovered three vials in his pocket, each containing one gram of cocaine. Officers then searched the bedroom and found a clear plastic bag of cocaine on the dresser, a container of cocaine, a plastic bag of Manitol in a ceiling panel, $927 in cash, and devices used for grinding and cutting cocaine for packaging. Defendant was transported to the DEA office, where he threatened to have Pariso killed if he testified against him in court.

On cross-examination Pariso testified that he had never met Ranallo prior to August 12, 1986, and denied going to defendant's home prior to August 13, 1986. Pariso said that the ledger book was not inventoried until July 1987 because it was in the custody of officers in the financial unit who used the book to prepare for their criminal conspiracy and asset forfeiture case against defendant. Pariso stated that shortly after defendant was released from custody following his arrest on September 3, Pariso went to defendant's home and advised him to stay away from Ranallo. He stated that based on information from Ranallo, three other individuals were arrested. He arrested Sabine in September 1987 and a search of the house uncovered more drug paraphernalia.

Gina Ranallo testified that she met defendant and Sabine in 1985 when she and Sabine were in the same bowling league. Ranallo stated that she had been to defendant's house and had seen defendant and Sabine use cocaine in the house. Ranallo first tried cocaine in 1985 at defendant's house and after that went to defendant's house every week to use cocaine. She began selling cocaine in 1985 after Diane Weckett and another girl told her how much money they were making. Sabine wrote Ranallo's name in a ledger notebook and gave her the cocaine to sell. Ranallo explained the columns in the book and stated that sometimes defendant would make the entries. Ranallo sold drugs for defendant for approximately nine months, until the end of May or early June 1986.

Ranallo stated that she used more cocaine than she sold and that she owed defendant money for the cocaine in addition to $1,000 Sabine had lent her. When she told defendant she wanted to quit selling cocaine, he told her that she had to either pay him back the money or sell cocaine until the debt was paid. Ranallo stated that defendant

called her constantly on the phone asking for the money. On August 11, 1986, Ranallo called the police.

On August 12, Ranallo met with Officers James Marino and Rosemary Berzinski and agreed to work with them. She told the officers that she could bring an officer to defendant's house only if he posed as her boyfriend. That evening she met Pariso, who would pose as her boyfriend "Joey."

On August 13, Ranallo took Pariso to defendant's house for the first time and introduced him as her boyfriend "Joey." They discussed Ranallo's debt and Pariso gave defendant $200. Defendant told Pariso it was not enough money, gave Pariso his number and told Pariso to contact him to make an agreement. Ranallo never returned to defendant's house with Pariso after August 13.

One night in September 1986, after defendant had been arrested and released from custody, Ranallo encountered defendant waiting for her in the gangway of her apartment building. Defendant threatened Ranallo and slapped her in the face. She stated that she and her family also received threatening phone calls from defendant and Sabine.

On cross-examination, Ranallo said that the writing in the ledger book looked like Sabine's handwriting. On redirect, Ranallo said that none of the other girls listed in the ledger would go to the police and that they were no longer friends since she had gone to the police.

Next, Officer James Marino testified regarding the meeting with Ranallo, corroborating Ranallo's and Pariso's testimony and adding that he was a surveillance officer on each trip Pariso made to defendant's home. Marino testified that he obtained a search warrant on September 3, 1986, which allowed the officers to search for any controlled substances or narcotics, and any ledgers, books or records that could substantiate any sale of narcotics. Police recovered cocaine from defendant's pockets and took photographs of the items recovered in the search of defendant's home. Marino stated that he saw two propane torches in defendant's home on September 3, 1986, and did not take them at the time, although they were eventually recovered. He also stated that while he knew that Officer Pariso smoked cigarettes, he had never seen him smoke Parliaments.

Detective Michael Cummings testified that he was involved in the execution of the search warrant on September 3, 1986, and that at that time, he discovered his gun missing. He searched for the gun for 20 to 30 minutes, and failing to find it, filled out a lost-and-found report that evening. A few days later, defendant's attorney called the station and said the gun had been found in defendant's home. Cummings retrieved his gun and filed a report showing the date the gun

was returned. He denied purposefully leaving the gun at defendant's home.

At the close of the State's case, the defense moved for directed verdict and the motion was denied. Norma Jollotta testified for the defense. She stated that she and defendant had been close for many years. She had known Ranallo for five or six years. Jollotta denied having ever seen cocaine in defendant's house and denied ever using or selling cocaine. On cross-examination, she stated that she had heard about defendant's arrest, but denied being in his home during August or September of 1986. She stated that at that time, Sabine was not in good shape. She never saw any drug paraphernalia in defendant's bedroom in the many times she had been to defendant's house. She did not know the names listed in the ledger. Diane Weckett is Jollotta's sister-in-law and is a very close friend of both defendant and Sabine.

Next, defendant testified that in August 1986 he was on medical leave from Coca Cola Bottling Company and had been on leave since around Thanksgiving, 1984. He stated that he got to know Ranallo through his wife because they were good friends. He stated that he met Pariso, introduced to him as "Joey," in late May or early June of 1986 when Ranallo brought him to his home. Defendant stated that they would come to his house frequently to socialize.

Approximately mid-June, Pariso told defendant that he was a drug dealer but that he had lost his supplier. Pariso said that he wanted to make some money and repay some of the money defendant had lent to Ranallo, if defendant could supply him with drugs. Pariso said that he would take care of everything, and all defendant had to do was get the bulk packages. After three to five conversations, defendant told Pariso he would find him a new supplier. Pariso also asked if they could run the drugs from defendant's house because it was a discreet place, and defendant agreed to let Pariso use the bedroom.

Defendant testified that he first obtained drugs for Pariso in late June 1986. Defendant brought one ounce of cocaine home and Pariso came over with a "box of stuff." Pariso went into the bedroom, came out a few minutes later, and left shortly thereafter. Defendant stated that he gave Pariso the cocaine in cigarette packs supplied by Pariso. Defendant admitted that he gave Pariso two ounces of cocaine on August 18 and 21, but denied making any profit on the sale. When defendant returned home from jail, he found a gun tucked between his waterbed mattress and frame. Defendant called his attorney and turned the gun over to the attorney.

Defendant denied going to Ranallo's house and slapping her. He testified that Ranallo continuously made harassing phone calls to his home while he was in jail and that when he was released he called her and told her to stop or he would "ruin her bowling." The next day, Pariso came over to defendant's home and told him to stay away from Ranallo. Defendant stated that he had 10 or 15 tapes of Ranallo's phone calls, but that Pariso had confiscated them.

Defendant denied that Ranallo or any other girls sold cocaine for him, and said that he had never seen the ledger book. He further stated that the writing in the book was neither his nor that of his wife. He stated prior to June 1986 he had never been involved in selling cocaine.

On cross-examination, defendant testified that he ran across many different people in his job as a vending machine repairman. He knew the general area to go to find a drug supplier for Pariso, and went to Wells Street. Defendant talked to a man named "Nick" who he met through a man named "Bob." He would not give the last names of either man because they had threatened to kill him.

Defendant further testified that he had supplied Pariso with cocaine five or six times prior to August 18, 1986, and did so because he was running low on money. He stated that his bank account was dwindling because his wife had had several operations and one of their cars had been wrecked. He admitted that he had purchased some of the drug paraphernalia found in the bedroom. He admitted that his wife smoked Parliament cigarettes and denied having any cocaine on his person at the time of arrest. He stated that the propane tanks belonged to him and his brother-in-law and were kept with his other tools for soldering.

Carol Diamond testified that at the time of the drug transactions she was staying with defendant and Sabine in a spare room. Diamond said that she knew Gina and that Gina's allegations about defendant's cocaine use were false. Diamond stated that she met Pariso in May 1986 when Gina introduced him as her boyfriend, and that defendant was not home at the time. She never saw a ledger book, even though she often cleaned house for defendant. She never saw any narcotic drugs or drug paraphernalia. She did not go to the police station to help defendant and Sabine after they were arrested because she thought it would not do them any good.

Following closing arguments and deliberations, the jury found defendant guilty on three counts of delivery of a controlled substance. After a hearing, defendant was sentenced to 10 years on each count

to run concurrently and fined $25,000 on each count. Defendant's timely appeal followed.

Initially, defendant contends that he was deprived of due process of law when the trial court granted the State's motion *in limine* prohibiting evidence that defendant lacked prior narcotics convictions. Defendant argues that such evidence would have shown his lack of predisposition to sell cocaine in support of his defense of entrapment. Entrapment is defined in section 7—12 of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 7—12), which states in relevant part:

> "A person is not guilty of an offense if his conduct is incited or induced by a public officer or employee, or agent of either, for the purpose of obtaining evidence for the prosecution of such person. However, this Section is inapplicable if a public officer or employee, or agent of either, merely affords to such person the opportunity or facility for committing an offense in furtherance of a criminal purpose which such person has originated."

In response, the State argues that defendant was not entitled to present evidence that he had no prior narcotics convictions in order to bolster his good character. (See *People v. Batinich* (1990), 196 Ill. App. 3d 1078, 1085-86, 554 N.E.2d 613.) In *Batinich*, the defendant was charged with delivery of a controlled substance and sought to introduce evidence that he was a law-abiding citizen through the facts that the had never been arrested, charged or convicted of a crime. *Batinich*, 196 Ill. App. 3d at 1085.

Citing *People v. Flax* (1986), 147 Ill. App. 3d 943, 498 N.E.2d 667, the *Batinich* court stated that a defendant in a criminal case could present evidence of his good character in order to establish that his character traits are inconsistent with the commission of the crime charged, but further stated that the admission of such evidence was within the sound discretion of the trial court. (*Batinich*, 196 Ill. App. 3d at 1085-86; see also *People v. Kurena* (1980), 87 Ill. App. 3d 771, 778, 410 N.E.2d 277.) The *Batinich* court ultimately held that even if evidence of a defendant's past criminal history or lack thereof should have been admitted, it was harmless error.

*Batinich*, however, is distinguishable from the present case in that the defendant there did not raise the affirmative defense of entrapment. *Flax* is distinguishable in that it is not even a narcotics case and also does not involve entrapment. *Batinich* and *Flax* are further distinguishable in that they held that a criminal defendant could not prove his *good character* by presenting evidence of the fact that he

had never been convicted of a crime. *Batinich*, 196 Ill. App. 3d at 1085; *Flax*, 147 Ill. App. 3d at 952.

■■ In the present case, defendant attempted to present similar evidence to prove an *element* of his affirmative defense of entrapment, which is an entirely different purpose and use of the evidence. The present case is more similar to *People v. Lynch* (1984), 104 Ill. 2d 194, 470 N.E.2d 1018, wherein the Illinois Supreme Court held that a victim's convictions for violent crimes are admissible to show that the victim was the aggressor when the defense of self-defense is raised. In *Lynch*, the court reasoned that the convictions would affect the jury's judgment of the credibility of the various versions of the facts. (*Lynch*, 104 Ill. 2d at 199.) The court held that it was error not to afford the defendant the opportunity to present evidence of the victim's history of aggressive behavior by admitting the victim's convictions. 104 Ill. 2d at 199.

Predisposition is established by a defendant's willingness to participate in criminal activity before defendant's initial exposure to government agents. (*People v. Connor* (1988), 176 Ill. App. 3d 900, 906, 531 N.E.2d 966.) Other factors to be considered in assessing predisposition include defendant's initial reluctance or willingness to commit the crime, the defendant's familiarity with drugs and his willingness to accommodate the needs of drug users, the defendant's willingness to make a profit from the illegal act, the defendant's prior or current use of drugs, and the defendant's participation in the testing of drugs. (*People v. Keen* (1990), 206 Ill. App. 3d 940, 564 N.E.2d 1314.) Whether defendant had ready access to a drug supply may be considered. *People v. Beavers* (1986), 141 Ill. App. 3d 790, 795, 491 N.E.2d 438.

In *People v. Bean* (1978), 63 Ill. App. 3d 264, 379 N.E.2d 723, the defendant, in an effort to demonstrate that he was not predisposed to commit the crime of delivering a controlled substance, presented evidence that he had never been arrested prior to the charged occurrence. (*Bean*, 63 Ill. App. 3d at 274.) The court stated that "while the past history of a defendant may be a relevant consideration in determining whether there has been entrapment, it is not controlling." 63 Ill. App. 2d at 274, citing *People v. Washington* (1967), 81 Ill. App. 2d 162, 225 N.E.2d 673.

Although the disputed evidence may not be controlling, it is evidence that tends to imply that defendant was not predisposed to deal narcotics. Since predisposition is an element of the affirmative defense of entrapment, defendant must be given the opportunity to present such evidence. (U.S. Const., amend. XIV; *People v. Katsigian-*

*nis* (1988), 171 Ill. App. 3d 1090, 1097, 526 N.E.2d 508.) Therefore, the trial court erred when it excluded evidence of defendant's lack of a criminal record.

In the instant case, the evidence against defendant of his predisposition to sell cocaine is overwhelming. The record indicates that defendant delivered cocaine to Officer Pariso on three occasions, beginning on August 18, 1986. Defendant admitted that he obtained cocaine five or six times for Pariso prior to August 18, and that he was not forced to do so, but did so because he was low on money. The record further shows that defendant was familiar with drugs and how to obtain them, as he knew where to go to find a supplier for Pariso. The record also shows that defendant used drugs, that he profited from drugs, and that he participated in the cutting of drugs. While the trial court excluded relevant evidence, the error was harmless beyond a reasonable doubt.

Next, defendant argues that the trial court erred in prohibiting defendant from presenting evidence of an alleged incident of police intimidation. Defense counsel argued prior to trial for the admission of evidence that police officers came to defendant's house the night before his trial and threatened him, kicked his dog, and told him that if Diane Weckett and Norma Jollotta were to testify at trial, they would return and kill defendant's other dog. Defense counsel told the court that defendant could not identify the men because they wore ski masks over their faces and the license plates on their car were covered. The trial court refused to admit the proposed evidence unless the defendant came up with proof that the incident actually took place. Defense counsel told the court it would "try to get the proof that the Court needs in order to tie it together." At no time during the trial did defendant offer any proof to substantiate his claim. Defendant argues, nevertheless, that the evidence would have supported his claim of a police conspiracy.

The State responds that the trial court did not err in prohibiting admission of this evidence because defendant could not substantiate the identities of the alleged intimidators.

The test of admissibility of evidence is whether it fairly tends to prove the particular offense charged. (*People v. Peter* (1973), 55 Ill. 2d 443, 459, 303 N.E.2d 398.) Whether what is offered as evidence will be admitted or excluded depends upon whether it tends to make the question of guilt more or less probable, *i.e.*, whether it is relevant. (*People v. Monroe* (1977), 66 Ill. 2d 317, 362 N.E.2d 295; *People v. Rodgers* (1972), 53 Ill. 2d 207, 214-15, 290 N.E.2d 251.) A trial court may reject offered evidence on grounds of irrelevance if it has little

probative value due to its remoteness, uncertainty or its possibly unfair, prejudicial nature. (*People v. Boyd* (1980), 81 Ill. App. 3d 259, 263, 401 N.E.2d 304.) The admission of evidence in criminal trials is within the sound discretion of the trial court, and its ruling should not be reversed absent a clear showing of abuse of that discretion. *People v. Ward* (1984), 101 Ill. 2d 443, 463 N.E.2d 696.

■■ The evidence defendant sought to admit was his own testimony that the incident occurred and that he thought the intimidators were police officers. However, defendant failed to offer any other proof that the alleged incident had ever occurred. The evidence was uncertain, prejudicial, and open to speculation as defendant failed to substantiate the identities of the alleged intimidators. The relevance of the evidence was therefore questionable, and the trial court properly denied its admission.

Next, defendant contends that the court did not consider factors in mitigation in sentencing him to 10 years for delivery of more than 30 grams of a substance containing cocaine. The State responds that the trial court properly considered factors in aggravation and mitigation and that the sentence was within the statutory range.

This court is not a sentencing court, and the sentence of a trial court will be affirmed absent a clear abuse of discretion. *People v. Cox* (1980), 82 Ill. 2d 268, 275, 412 N.E.2d 541, 547; *People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882, 884.

In sentencing a defendant, the trial court may consider the gravity and circumstances of the offense, as well as defendant's mental capacity, age, demeanor and credibility. (*E.g., Perruquet*, 68 Ill. 2d at 154, 368 N.E.2d at 884.) Furthermore, the trial court must balance the objectives of protecting society and rehabilitating the defendant. (See *People v. Harris* (1989), 187 Ill. App. 3d 832, 844, 543 N.E.2d 859, 866.) Once struck, a reviewing court will hesitate to upset this balance, especially where the sentence falls within the statutory limitation. *People v. Lambrechts* (1977), 69 Ill. 2d 544, 559, 372 N.E.2d 641, 649.

■■ The record in this case indicates that defendant was sentenced to 10 years for each of three counts, to be served concurrently. This sentence is well within the statutory guidelines for a Class X felony such as delivery of 30 grams or more of a controlled substance containing cocaine. (See Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(3) (for a Class X felony, a term shall be not less than 6 years and not more than 30 years).) The record indicates that the trial court considered that defendant was 47 years old, that since 1963 he had not been convicted of a crime, and that he worked at the same com-

pany for 19 years. The court also considered the hardship a sentence would cause defendant's wife, but determined that his illegal activities "threaten serious physical harm to individuals and society at large."

Consequently, defendant has failed to show that the trial court erred in sentencing him to an extended term.

Finally, defendant argues that the court erred in dismissing his *pro se* post-conviction petition without appointing counsel or conducting an evidentiary hearing.

An action brought under the Post-Conviction Hearing Act is a collateral attack on a judgment of conviction; it is not an appeal from that conviction. (*People v. Green* (1991), 218 Ill. App. 3d 71, 578 N.E.2d 169.) The purpose of the proceedings is to resolve allegations that constitutional violations occurred at trial when those allegations were not, or could not have been, adjudicated previously. (*People v. Sanders* (1991), 209 Ill. App. 3d 366, 373, 568 N.E.2d 200.) An evidentiary hearing is called for only when the petitioner makes a substantial showing of deprivation of constitutional rights, and to accomplish this, the allegations in the petition must be supported by the record in the case or by accompanying affidavits. (*People v. Gaines* (1984), 105 Ill. 2d 79, 91-92, 473 N.E.2d 868.) A trial court may summarily dismiss a petition for post-conviction relief if the petitioner fails to set forth facts which make the required showing as to the claimed constitutional deprivation (*Green*, 218 Ill. App. 3d at 75, 578 N.E.2d at 172), and the trial court's determination will not be disturbed unless manifestly erroneous. *People v. Silagy* (1987), 116 Ill. 2d 357, 365, 507 N.E.2d 830.

Defendant claims that he is entitled to a hearing because he was deprived of his right to effective counsel during his trial. Defendant contends that defense counsel was ineffective for failing to investigate and present key expert evidence, laboring under a conflict of interests, and failing to move to suppress illegally seized evidence.

The State responds that defendant's failure to raise the issue of ineffective assistance of counsel on direct appeal constitutes a waiver of this issue for review. Alternatively, the State argues that the court did not err in summarily dismissing the petition because defendant's petition was not supported by the record. The State further argues that defendant failed to show in his petition that the outcome of the trial would have been different.

In a post-conviction proceeding, all issues which could have been presented on direct appeal but were not are deemed waived. (*People v. Stewart* (1988), 123 Ill. 2d 368, 372, 528 N.E.2d 631.) Defendant's arguments regarding trial counsel's representation were matters of

record which could have been raised on direct appeal and are therefore waived. (See *People v. Jones* (1985), 109 Ill. 2d 19, 24, 485 N.E.2d 363.) Nevertheless, an examination of the record indicates that defendant has failed to show that trial counsel's representation was ineffective.

The standard for evaluating the effectiveness of counsel was first set forth as a two-part test in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, and adopted by the Illinois Supreme Court in *People v. Albanese* (1984), 104 Ill. 2d 504, 525-27, 473 N.E.2d 1246. The *Strickland* test requires that defendant first show that counsel's performance was below an objective standard of reasonableness, thus creating a constitutional deprivation. Defendant must also show that his counsel's deficient performance substantially prejudiced his defense, and but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; *People v. Flores* (1989), 128 Ill. 2d 66, 80-81, 538 N.E.2d 481.

■ Defendant first claims that trial counsel was incompetent because he failed to present an expert in handwriting analysis to refute that the ledger admitted at trial contained his handwriting. A claim of incompetency which arises from a matter of defense strategy will not support a claim of ineffective representation. (*People v. Madej* (1985), 106 Ill. 2d 201, 478 N.E.2d 392.) Counsel's performance must be evaluated based on the entire record and not on isolated instances of alleged incompetence called into question by defendant. (*Flores*, 128 Ill. 2d at 107.) An examination of the record indicates that on cross-examination, defendant was asked to compare the handwriting in the ledger to handwriting on personal papers belonging to defendant and his wife, and noted a similarity. The record indicates that the jury was permitted to compare the personal papers with the ledger book during its deliberations. The record further discloses the eyewitness testimony of Ranallo, who saw defendant and his wife make entries in the ledger, and of Officer Pariso, who testified that defendant showed him the ledger book and how he made entries therein. Defendant has not shown that the testimony of a handwriting expert would have altered the outcome of the trial.

Next, defendant contends that he was denied effective counsel because his attorney labored under a conflict of interest. Defendant claims that trial counsel did not vigorously represent him because he feared being sued by defendant regarding an unrelated case.

The prohibition against an attorney serving a client where there is a conflict of interest is based upon the principle that "no man can

serve two masters," and if a defense attorney falls into this category, he may be hindering his client's sixth amendment right to counsel. (*People v. Arnold* (1991), 218 Ill. App. 3d 647, 577 N.E.2d 1355; *People v. Spreitzer* (1988), 123 Ill. 2d 1, 13, 525 N.E.2d 30.) Effective assistance means assistance by an attorney whose allegiance to his client is not diluted by conflicting interests or inconsistent obligations. *People v. Washington* (1984), 101 Ill. 2d 104, 110, 461 N.E.2d 393.

Where defense counsel has a relationship with a person or entity which would benefit from an unfavorable verdict for the defendant, counsel will be deemed to have a *per se* conflict of interest making him ineligible to represent defendant in that matter. (*Arnold*, 218 Ill. App. 3d at 655.) In *Arnold*, the court found that the fact that defendant filed suit against his defense counsel did not create a *per se* conflict. The *Arnold* court, citing *People v. Hardeman* (1990), 203 Ill. App. 3d 482, 560 N.E.2d 1198, determined that a pending lawsuit did not create the kind of conflict that would preclude counsel from continuing to represent the defendant and satisfy his sixth amendment rights. *Arnold*, 218 Ill. App. 3d at 656.

██ Nothing in the present case suggests that defense counsel labored under a *per se* conflict of interest. The record does not reflect that defendant ever filed a complaint against defense counsel in this case or in any other case.[2] The record, in fact, indicates that defense counsel vigorously represented defendant in that he extensively cross-examined the State's witnesses, attempting to impeach Ranallo, and to make a case for entrapment by Pariso. Defense counsel represented defendant at the sentencing hearing and argued in mitigation for him. Defense counsel also filed post-trial motions which he argued extensively. Accordingly, defendant has failed to show that defense counsel's performance was hampered by a conflict of interest.

██ Finally, defendant argues that his trial counsel failed to move to suppress two propane tanks found in defendant's home and admitted as evidence at trial. Defendant's argument has no merit. The decision to file a motion to suppress is a matter of trial tactics which seldom has any bearing on the incompetency of counsel. (*People v. Mendez* (1991), 221 Ill. App. 3d 868, 873, citing *People v. Purnell* (1984), 126 Ill. App. 3d 608, 624, 467 N.E.2d 1160.) Defendant has not shown that such a motion would have been granted, nor that the

---

[2]In its brief, the State notes that in the trial court's ruling on defendant's motion for leave to file late notice of appeal, the trial judge made reference to the fact that defendant had filed a complaint against defense counsel with the Attorney Registration and Disciplinary Committee two years prior to his motion.

outcome of the trial would have been different had it been granted. Thus, defendant has not fulfilled the second prong of the *Strickland* test for ineffectiveness of counsel.

Our examination of the record indicates that defendant has failed to show his trial counsel was ineffective. Thus, the trial court correctly dismissed defendant's petition without a hearing.

For the aforementioned reasons, the judgment of the trial court is affirmed.

Affirmed.

BUCKLEY, P.J., and MANNING, J., concur.